**Henry Arthur DRAKE,**
**Petitioner-Appellant,**

v.

**Ralph KEMP, Warden,**
**Respondent-Appellee.**

No. 83–8047.

United States Court of Appeals,
Eleventh Circuit.

May 31, 1985.

Rehearing En Banc Denied
July 23, 1985.

Mary J. Wilkes, Atlanta, Ga., for petitioner-appellant.

Susan V. Boleyn, Asst. Atty. Gen., Paula K. Smith, Staff Asst. Atty. Gen., Atlanta, Ga., for respondent-appellee.

Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HENDERSON, HATCHETT, ANDERSON, and CLARK, Circuit Judges.*

---

* All of the Judges of the Court, except Judge Clark, join in the disposition of the six issues

R. LANIER ANDERSON, III, Circuit Judge:

## INTRODUCTION

This case was taken en banc principally to consider two of the several constitutional claims asserted by appellant Henry Drake. In Section One of this opinion, we discuss the claim that the instruction on intent at Drake's trial improperly shifted the burden of proof in violation of *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). We conclude that there was a *Sandstrom* violation, and that the error was not harmless beyond a reasonable doubt. In Section Two of this opinion, we discuss Drake's claim that the prosecutor's argument during the sentencing phase of his capital trial rendered the sentencing phase fundamentally unfair. We conclude that the prosecutor's argument did render the sentencing phase of the trial fundamentally unfair.

■ In addition to the two issues which this opinion will discuss, Drake asserted six other constitutional claims: (1) that new evidence based on the recantation of a key witness against Drake warranted habeas corpus relief; (2) that the use of inconsistent theories in prosecuting Drake and a defendant allegedly involved in the same crimes violated due process; (3) that the prosecution's knowing use of perjured testimony violated due process; (4) that the aggravating circumstance—the offense was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim," Ga.Code Ann. § 17-10-30(b)(7)—was unconstitutionally overbroad and vague as applied to Drake's case, in violation of *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980); (5) that the instructions during the sentencing phase of Drake's trial failed to inform the jury that it need not impose the death penalty even if a statutory aggravating circumstance had been found beyond a reasonable doubt; and (6) that Drake's sentence of death was disproportionate under *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). The panel affirmed the district court's denial of relief on each of these six issues. *Drake v. Francis*, 727 F.2d 990 (11th Cir.), *vacated for reh'g en banc*, 727 F.2d 990, 1003 (11th Cir.1984). With respect to issue (5) above, Drake's challenge to the trial court's sentencing instructions, we reinstate Part VIII of the panel opinion. *See Drake v. Francis*, 727 F.2d at 1000. We decline to reach issues (1), (2), (3), (4), and (6), exercising our discretion not to do so in light of our resolution of the case granting relief on other grounds.

C.E. Eberhart was savagely beaten and stabbed on December 5, 1975, as he worked in his barber shop in Colbert, Georgia. He died a few months later from head wounds without regaining consciousness. A bloody hammer and pocket knife were found on the premises.

Investigation of the crime soon focused on William Campbell and Henry Drake. The two men, along with a woman, had been in Colbert the day of the attack and Campbell was seen lounging near the bar-

referred to in the Introduction to Judge Anderson's opinion for the Court, reinstating the panel opinion with respect to one issue and declining to reach the other five issues. Judge Clark's specially concurring opinion discusses the additional grounds upon which he would also rest in granting the writ of habeas corpus.

All of the Judges of the Court join in Part I of Section One of Judge Anderson's opinion concluding that there was a *Sandstrom* violation. Judge Hill has also written separately on this issue.

The following Judges join in Part II of Section One of Judge Anderson's opinion concluding that the *Sandstrom* error was not harmless: Godbold, Chief Judge, and Judges Roney, Tjo-flat, Fay, Vance, Kravitch, Henderson, Hatchett, Anderson and Clark. Judges Hill and Johnson have each filed an opinion separately concurring in this result.

The following Judges join in Section Two of Judge Anderson's opinion concluding that the prosecutorial argument did render the sentencing phase fundamentally unfair: Godbold, Chief Judge, and Judges Roney, Tjoflat, Hill, Fay, Vance, Henderson, Hatchett, and Anderson. Judge Hill has also written separately on this issue. Judges Kravitch and Clark have each filed opinions separately concurring in the result only. Judge Johnson, without opinion, also concurs in the result only.

ber shop. A search of the house where Drake, Campbell, and the woman lived uncovered a Timex watch belonging to Eberhart in a drawer containing Campbell's clothes. Campbell and Drake were tried in separate trials. Campbell was tried first for murder and armed robbery. At trial, he claimed to have been sitting in the barber shop when Drake entered and attacked Eberhart. Campbell was convicted and sentenced to death.

At Drake's trial, the state proceeded on the theory that Campbell could not have committed the murder by himself. The victim, although elderly, was strong, while Campbell was weakened by asthma and emphysema. Campbell was the principal state witness linking Drake to the murder; he repeated the story he gave at his own trial. Drake testified and explained that, on the day of the attack, he had dropped Campbell off at the barber shop and then visited relatives in Colbert. He later returned to pick up Campbell and they drove to Madison, Georgia. This story was corroborated by family members who testified at trial. At the close of the evidence, and after a long deliberation, Drake was convicted of murder and armed robbery.

Drake was sentenced to death on the murder charge and to life imprisonment on the armed robbery charge. His convictions and sentences were affirmed on direct appeal by the Georgia Supreme Court. *Drake v. State*, 241 Ga. 583, 247 S.E.2d 57 (1978). Drake then petitioned the United States Supreme Court for a writ of certiorari which was denied. *Drake v. Georgia*, 440 U.S. 928, 99 S.Ct. 1265, 59 L.Ed.2d 485 (1979). Subsequently, in July 1979, Drake filed a petition for writ of habeas corpus in the Superior Court of Butts County, Georgia. After a hearing on the merits, the court denied relief. The Georgia Supreme Court and the United States Supreme Court both declined to review the denial of the state habeas petition.

Two years later, Drake filed an extraordinary motion for a new trial in the Madison County Superior Court alleging the discovery of new evidence that would prove his innocence. The new evidence was in the form of an affidavit by William Campbell, the prosecution's star witness against Drake, repudiating his previous testimony inculpating Drake. After a hearing, during which Campbell testified substantially to the same facts contained in his affidavit, the trial court denied the motion and the Georgia Supreme Court affirmed. *Drake v. State*, 248 Ga. 891, 287 S.E.2d 180 (1982). The Supreme Court again denied certiorari. *Drake v. Georgia*, 457 U.S. 1111, 102 S.Ct. 2915, 73 L.Ed.2d 1322 (1982).

In August 1982, Drake filed the instant petition for habeas corpus relief in the United States District Court for the Middle District of Georgia. The district court denied relief. On appeal, a panel of this court granted relief only on the issue involving the prosecutor's argument during the sentencing phase. *Drake v. Francis*, 727 F.2d 990 (11th Cir.1984). A petition for rehearing en banc was granted, thus vacating the panel opinion. 727 F.2d 1003 (11th Cir.1984).

SECTION ONE: *SANDSTROM* ISSUE

I. WAS THERE AN IMPERMISSIBLY BURDEN–SHIFTING INSTRUCTION UNDER *SANDSTROM*?[1]

Drake was charged with and convicted of armed robbery and murder. Drake argues that the trial judge's instruction regarding intent was impermissibly burden-shifting under *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). The relevant part of the instruction reads as follows:

> Ladies and gentlemen, I charge you that a criminal intent is a material and necessary ingredient in any criminal prosecution. *I charge you that the acts of a person of sound mind and discre-*

---

1. Although defense counsel made no objection to the jury charge at trial, there is no procedural default because the state habeas court reached the *Sandstrom* issue on the merits, *Drake v. Zant*, No. 4246, slip op. at 9 (Sup.Ct. Butts Cty.

Dec. 14, 1979), and the state has not claimed procedural default in this court or the district court; nor has it argued that defense counsel's failure to object should otherwise affect the *Sandstrom* analysis.

*tion are presumed to be the products of a person's will and a person of sound mind and discretion is presumed to intend the natural and probable consequences of his act, but both of these presumptions may be rebutted.* I charge you, however, that a person will not be presumed to act with criminal intent but the trials [sic] of fact may find such intent from consideration of the words, conduct, demeanor, motive, and all other circumstances connected with the act to which the accused is here prosecuted. You are the triers of the facts; therefore, it is a question of fact solely for your determination as to whether or not there was a criminal intent on the part of the Defendant, considering the facts and circumstances as disclosed by the evidence and deducting the deductions which might reasonably be drawn from these facts and circumstances. Now, while a criminal intention may be proven in more than one way, the question of whether the Defendant did act with criminal intention is finally and always a question for you, the Jury, to determine.

(Emphasis added).[2] The above emphasized instruction, which amounts to a mandatory rebuttable presumption on the essential element of intent, is virtually identical to the ones found impermissible in the recent Supreme Court case of *Francis v. Franklin*, —— U.S. ——, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), and in our recent en banc case of *Davis v. Kemp*, 752 F.2d 1515, 1517–19 (11th Cir.1985) (en banc). The state argues, however, that the trial court's general instruction regarding the state's burden of proof with respect to every element of the crimes charged and the instruction stating that "a person will not be presumed to act with criminal intent ...", was curative of any potentially burden-shifting instruction. *See Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973) (jury charge must be read as a whole). This contention must fail in light of *Francis v. Franklin* which considered substantially identical allegedly curative instructions and nevertheless held the instruction

as to intent to be impermissibly burden-shifting. *See Franklin*, —— U.S. at ——, 105 S.Ct. at 1974–1976; *accord, Davis*, 752 F.2d at 1517–19.

After a careful review of the entire jury charge, and employing the analysis set forth by the Supreme Court in *Francis v. Franklin*, we find that a reasonable juror could well have concluded that Drake bore the burden of proof on the necessary element of intent. The relevant portions of the jury instructions cannot be distinguished from the jury charge in *Francis v. Franklin*, which we find to be controlling. We thus conclude that the instruction violates *Sandstrom*.

## II. WAS THE *SANDSTROM* ERROR HARMLESS?

The Supreme Court has expressly left open the question whether a *Sandstrom* error can ever be harmless. *Francis v. Franklin*, —— U.S. at ——, 105 S.Ct. at 1977. However, our en banc court in *Davis* recently reaffirmed for this circuit that a *Sandstrom* error, like most other errors of constitutional magnitude, can be held harmless beyond a reasonable doubt. *Davis v. Kemp*, 752 F.2d at 1520–21; *see also McCleskey v. Kemp*, 753 F.2d 877, 902–03 (11th Cir.1985) (en banc). *Davis* identified two situations where harmless error analysis would be appropriate: (1) where the evidence of the defendant's guilt was overwhelming; and (2) where the instruction concerned an element of the crime which was not put in issue at trial. *Davis*, 752 F.2d at 1521 (citing *Lamb v. Jernigan*, 683 F.2d 1332, 1342 (11th Cir. 1982), *cert. denied*, 460 U.S. 1024, 103 S.Ct. 1276, 75 L.Ed.2d 496 (1983)). *Davis* clarified the first prong by recognizing that the analysis should usually focus on whether the evidence of *intent*, rather than the more inclusive issue of *guilt*, is overwhelming. *Davis*, 752 F.2d at 1521 & n. 10; *see Connecticut v. Johnson*, 460 U.S. 73, 86, 103 S.Ct. 969, 977, 74 L.Ed.2d 823 (1983) (plurality opinion); *id.* at 90, 96, 97, 99, 101, 103 S.Ct. at 979, 982, 983, 984, 985 (Powell, J., dissenting); *accord, Franklin v. Fran-*

---

**2.** The entire jury charge is reproduced as Appendix "A" to this opinion.

*cis,* 720 F.2d 1206, 1212 (11th Cir.1983), *aff'd,* — U.S. —, at —, 105 S.Ct. 1965, at 1977 (1985) (affirming this "court's conclusion that the evidence of intent was far from overwhelming ..."). Thus, in many cases, a *Sandstrom* error as to intent can be found harmless where the evidence of intent is overwhelming, even where there is conflicting evidence as to whether the defendant was the killer. *Davis,* 752 F.2d at 1521; *see also Brooks v. Kemp,* 762 F.2d 1383, 1390 (11th Cir.1985) (en banc). This is so because the erroneous intent instruction usually could affect only the jury's determination of intent, and could not possibly affect the jury's determination of who the killer was.[3] We turn, then, to the evidence of the perpetrator's intent to commit the crimes for which he was charged and convicted, to determine whether the evidence of intent was overwhelming.

■ The uncontradicted evidence indicates that the perpetrator struck the victim repeatedly in the head with a blunt instrument. The evidence also indicates that the victim was stabbed with a knife by the perpetrator. A bloody knife and hammer were found at the barber shop where the victim was killed. Numerous witnesses testified to the effect that there was blood all over the floor and the walls of the barber shop when they arrived at the scene after the attack. In addition, photographs were put in evidence corroborating this testimony. There was also considerable evidence concerning the extent of the damage done to the victim's head. Several witnesses testified that the victim was barely recognizable. Another testified that the blunt instrument was applied with such apparent force and repetition that a hole the size of one's hand had been gouged out of the victim's head.

Drake testified at trial and presented an alibi defense. Drake's testimony is summarized as follows: He and a friend, Mary Carruth, dropped William Campbell off at the barber shop in Colbert, Georgia, so that Campbell could get a haircut. Drake and Carruth then drove to Drake's mother's house a few miles out of town for supper. Later, not knowing that Campbell had murdered and robbed the barber, Drake and Carruth returned to Colbert and picked up Campbell in front of a laundromat, located across the street from the barber shop. Drake, Carruth, and Campbell then returned to their home in Madison, Georgia, where they spent the night. The next morning Campbell threateningly urged Drake to take him to Atlanta. Drake drove Campbell to Atlanta and dropped him off there.

Campbell was later found in Norton, Virginia. Carruth substantially corroborated Drake's testimony, although there were some discrepancies. For instance, she testified that Campbell explicitly told Drake on the night of the crimes that he [Campbell] had killed the barber, a fact which is noticeably absent from Drake's testimony. She also claimed that Campbell pulled a gun on Drake and forced him to drive to Atlanta. There was also corroborating testimony from several of Drake's relatives that Drake was present at his mother's house during the time the crimes were perpetrated. In addition, defense counsel, through cross-examination of the state's witnesses, further attempted to suggest that Campbell, not Drake, was the sole perpetrator. Finally, in closing, defense counsel argued that Campbell was the sole perpetrator, and that there was no testimony inculpating Drake other than Campbell's self-serving testimony, while physical evidence—blood samples taken from the barbershop door and from the handle of the hammer—pointed to Campbell's involvement.

---

**3.** A further refinement of the intent concept is appropriate. The particular instruction here that is erroneous is the mandate that the jury presume that the defendant intended the natural and probable consequences of his acts. The jury was expressly and properly charged that "criminal intent" was not to be presumed. The erroneous instruction here relates to subsidiary elements of "criminal intent," i.e., intent with respect to natural and probable consequences. Hereafter, when we refer to intent, we are referring to this latter meaning, and our concern will be to determine whether there is overwhelming evidence that Drake intended the natural and probable consequences of his acts.

The state's theory—despite Campbell's testimony as a prosecution witness that he was simply having his hair cut when Drake came in and robbed and murdered the barber—was that both Drake and Campbell committed the crimes. The prosecutor argued in closing that Campbell, since he was severely asthmatic, could not physically have murdered the barber without some assistance from Drake. Thus, as discussed more fully below, the state asserted a theory of accomplice liability.

The above discussion indicates that there was considerable controversy over who was the perpetrator of the crimes. Surely, the evidence implicating Drake as the killer is not overwhelming.

However, *Davis* and *Brooks* make it clear that in many cases an erroneous intent instruction could not possibly have affected the jury's determination of who the killer was, and thus if the evidence of the perpetrator's intent is overwhelming the erroneous intent instruction may be harmless. *Brooks v. Kemp,* 762 F.2d 1383, 1390 n. 9; *Davis,* 752 F.2d at 1521 & n. 10. If malice murder were the only theory asserted by the state, or the only theory submitted to the jury, we would conclude that the erroneous intent instruction was harmless on these facts. Under the malice murder theory, the only issue for the jury would have been whether Drake was present in the barber shop, as Campbell testified, or elsewhere, as Drake testified, and the questioned instruction could have had no bearing on this issue. Rather, the instruction would only have been relevant to the issue of whether the perpetrator of the murder intended death to result as the natural or probable consequence of the blows to the head. However, the unrebutted evidence here was that the blows were administered with extreme force and repetition, and this could not have been the

result of accident or other nonintentional conduct. Therefore, there was overwhelming evidence that the perpetrator intended to kill. *See Richard Tucker v. Kemp,* 762 F.2d 1496 (11th Cir.1985) (en banc) (unrebutted evidence of crushing, fatal blow to victim's skull with metal pole negated possibility that killing was accidental or otherwise unintentional). However, malice murder was not the only theory submitted to the jury. A prominent part of the prosecutor's case was the theory of accomplice liability.

Drake argues that there is no way to determine whether the jury found that Drake was the actual killer and/or armed robber. The evidence before the jury implicitly raised the issue of Drake's liability as an accomplice to the robbery and murder. The state indicted Drake on three theories of murder: malice murder, felony murder, and aiding and abetting a murder, each of which could independently support a conviction for murder under Georgia law. The last two theories, felony murder and aiding and abetting a murder, do not require a finding that the defendant killed or even intended to kill. With respect to felony murder, guilt as to murder is imputed from a finding that the defendant himself killed the victim while intentionally committing another felony; or guilt as to murder could be imputed from a finding that a co-participant killed the victim while the defendant and the co-participant were engaged in the commission of another felony.[4] With respect to aiding and abetting a murder, guilt as to murder is imputed if the defendant "intentionally aids or abets in the commission of the crime." Jury Instructions, Trial Transcript at 490–91. The judge instructed the jury on all three theories and the jury returned only a general verdict of guilty.[5]

---

**4.** Drake contends that his accomplice liability argument applies to both the felony murder and aiding and abetting theories. Because of our disposition with regard to the aiding and abetting theory, we need not reach the felony murder theory.

**5.** Similarly, with respect to the armed robbery charge, upon which the jury also returned a

general verdict, the trial court's instructions permitted the jury to convict on two theories of armed robbery. The jury might have found Drake guilty of the actual robbery. However, the jury was also allowed to impute guilt as to armed robbery by finding, pursuant to the trial court's aiding and abetting instruction, that Drake aided and abetted Campbell's armed robbery.

If the jury found Drake guilty only on a theory of accomplice liability, then it is clear that the state's burden in the *Sandstrom* context would be to prove *both* that the actual killer, presumably Campbell, intended to kill, *and* that Drake intended to aid and abet the crimes. Because of the forceful and repeated blows dealt by the perpetrator, *see* discussion in text *supra,* we assume that the actual killer intended to kill. The crucial question then becomes whether the erroneous intent instruction affected the jury's determination of whether Drake intended to aid and abet the crimes.

Drake argues that the evidence implicitly raised the issue of Drake's liability as an accomplice, that the accomplice theory was a prominent part of the state's case, and that this theory was submitted to the jury. The state's theory of the case was that both Drake and Campbell were present in the barber shop and participated in the beating and killing. The jury might well have concluded that Campbell was the prime mover in both the murder and the armed robbery, and that Drake merely assisted (*i.e.,* aided and abetted).[6] The prosecutor argued to the jury:

> [The law of conspiracy] means that any time two or more people get together, they don't even have to speak; if the thought crosses their mind and each knows what the other is doing and they go and do that unlawful act. Not only that but if a person commits a crime and is in the process of committing it and concealing it, and another party joins in and helps and aids and abets in the commission of that crime, they have joined into that conspiracy themselves. And under the law, they are responsible from the beginning to the end. It is a good law. It is designed to punish everyone who is involved in the commission of that crime. The Court will charge you what a party to a crime is; and that is *anyone that is either directly or indirectly involved in it or aids and abets or does anything to conceal it or get another person away from there;* not [my] law . . . the law all over the State of Georgia and [it] applies to each and every citizen.

Trial Transcript at 470 (emphasis added); *see also* Trial Transcript at 441–43 (prosecutor opened his closing argument by reading the Georgia statute relating to accomplice liability, and quoting from a Georgia case to the effect that a co-conspirator who remains in the get-away car while others rob a store is liable for the killing of the merchant).[7]

The aiding and abetting theory was prominent throughout the trial: implicitly in the testimony of Drake and Carruth, and explicitly in the opening statements of both sides, in the prosecutor's initial and closing summations to the jury, in defense counsel's closing argument, and in the trial court's charge to the jury.[8] Thus, the choice to convict Drake of armed robbery and murder solely on the basis of Drake's aiding and abetting the crimes committed by Campbell was squarely before the jury.

Since aiding and abetting must be intentional, and since that intent element could

---

**6.** If the jury convicted on the basis of this accomplice theory (under which Drake did not himself administer the blows to the victim), the jury would have to have inferred that Drake intended to aid or abet from his mere presence in the barber shop or from some act of assistance (short of himself administering the blows) which had the natural or probable consequence of furthering the crime. The erroneous jury instruction shifted the burden of proof in the inference process.

**7.** Also, Drake suggests another scenario of accomplice liability as follows. Drake contends that the inconsistencies and incredibility of Campbell's testimony might have led the jury to reject much of Campbell's testimony, and to accept much of Drake's testimony that he merely dropped Campbell off and later picked him up and then later still took him to Atlanta. Nonetheless, Drake theorizes, the jury may have rejected Drake's disclaimer of knowledge of Campbell's plan to rob or harm the barber. Thus, he argues, the jury might have found that Drake aided and abetted the crimes by delivering Campbell to the scene of the crimes, picking him up, and helping him escape to Atlanta.

**8.** In another context, the district court found that "in Campbell's trial, the State's theory was that Drake was probably just the 'pick-up man.'" *Drake v. Francis,* No. 82–99–ATH, slip op. at 8 n. 4 (M.D.Ga. Dec. 15, 1982).

have been affected by the erroneous burden-shifting instruction on intent, the issue before us becomes whether there is overwhelming evidence that Drake *intended* to aid and abet the crimes. The only evidence on this issue came from Campbell, which falls far short of constituting overwhelming evidence.

*Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), sets out the standard by which most constitutional errors should be considered harmless. Under *Chapman*, a criminal conviction must be reversed if the appellate court cannot say "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 24, 87 S.Ct. at 828. The problem here is that the erroneous instruction shifted the burden to Drake to disprove intent, an essential element of the crime of aiding and abetting. This the state may not do. *See Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) (state has burden of proving every element of the crime charged beyond a reasonable doubt). Since this intent element was at issue in the case, and since there was not overwhelming evidence that Drake intended to aid and abet the crimes, we conclude that the error was not harmless beyond a reasonable doubt.

Accordingly, we conclude that Drake is entitled to relief on his *Sandstrom* claim with respect to both the armed robbery and the murder convictions.

## SECTION TWO: PROSECUTORIAL ARGUMENT [9]

Part I of this section of the opinion will discuss the facts relevant to Drake's challenge to the prosecutorial argument at the sentencing phase. Part II sets forth the standard of review adopted by this court in *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir. 1985) (en banc). Part III will examine arguments made by the prosecutor in this case to determine their propriety. Finally, Part IV will consider whether the improper arguments rendered Drake's capital sentencing hearing "fundamentally unfair." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974).

### I. FACTS

Following Drake's conviction, the trial court commenced the sentencing phase of the capital trial. Under Georgia law, the hearing is designed to bring out evidence relevant to sentencing and provide the jury with the guidance constitutionally required for imposition of the death penalty. *See Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Ga.Code Ann. § 17–10–2(c). Most capital sentencing hearings consist of additional evidence put on by the state and the defendant and closing arguments of counsel.

The state began by introducing evidence of Drake's previous criminal record. Drake had been convicted of the offenses of burglary, abandoning minor children, and obtaining money by a false writing. This was the sole evidence introduced in aggravation of sentence other than the evidence of the crime itself.

Drake then took the stand. He stated that he was sorry for the victim, but reiterated that he was not the murderer. This was the only evidence put forth in mitigation.

Each attorney then delivered a closing argument to the jury.[10] Following instructions on the issue of sentence, the jury retired for its deliberation. It returned a verdict of death on the murder count.[11]

---

**9.** We might have declined to address Drake's prosecutorial argument claim, since our decision on the *Sandstrom* issue will require a new trial on malice murder and armed robbery and, thus, a new sentencing hearing if Drake is found guilty on the murder charge. However, for the same reasons that it is desirable in many cases for district courts to address alternatively the several claims in capital cases, we exercise our discretion to proceed in this case, in the mode of an alternative holding, to address the issue of prosecutorial argument at sentencing.

**10.** The prosecutor, Bryant Huff, gave a closing argument that filled 8 transcript pages; the alleged improprieties in the argument will be addressed in Part III of this opinion.

**11.** Pursuant to Georgia law, the jury is required to find at least one statutory aggravating circumstance beyond a reasonable doubt in order

## II. STANDARD OF REVIEW

■ In *Brooks v. Kemp*, 762 F.2d at 1397 (11th Cir.1984) (en banc), this court considered the standard for federal habeas corpus review of prosecutorial closing arguments. Improper argument will only warrant relief if it renders a petitioner's trial or sentencing "fundamentally unfair." 762 F.2d at 1399–1400 (citing *Donnelly v. De-Christoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)). That determination depends on whether there is a reasonable probability that, in the absence of the improper arguments, the outcome would have been different. 762 F.2d at 1401–1402 (citing *Strickland v. Washington*, —— U.S. ——, ——, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674, 698 (1974)). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Strickland v. Washington*, —— U.S. at ——, 104 S.Ct. at 2069, 80 L.Ed.2d at 698.

Our review must first examine the argument itself to see if improper arguments were made. Because we do find an improper prosecutorial argument, we will then consider whether there is a reasonable probability that the outcome of Drake's sentencing hearing would have been different had the argument not been made.

## III. PROPRIETY OF PROSECUTORIAL ARGUMENT

■ Drake claims that argument made by prosecutor Bryant Huff during his capital sentencing hearing was impermissible. A Georgia prosecutor may argue subjects relevant to the capital sentencing jury's decision. Those subjects generally include the facts of the crime, individual characteristics of the defendant (including future dangerousness and rehabilitative prospect), and the valid penological justifications for the punishment (retribution, incapacitation, and general deterrence). *Brooks v. Kemp*,

762 F.2d at 1405–1408. We will now examine the arguments complained of by Drake to see if they exceeded those legitimate sentencing considerations.

1. Huff argued to the jury by reading quotes from two opinions of the Georgia Supreme Court:

If your Honor please, in connection, in my urging you to submit this to the jury, the State of Georgia, the Supreme Court of Georgia in *Hawkins v. State*, in 25 Ga., page 207, the Court, in upholding the murder and the death sentence in that case said this: "Human life is sacrificed at this day throughout the land with more indifference than the life of a dog, especially if it be a good dog." They went on to hold that Cain was the first murderer, but who was the last is known only to those who have read this morning's papers. And they said, "If this crime goes unpunished, let our skirts at least be free from the stain of blood guiltiness."

If your Honor please, in *Eberhart v. State*, 47 Ga. [598], page 610, the Justice of the Supreme Court of Georgia said this, in connection with the death sentence for murder: "We have, however, no sympathy with that sickly sentimentality that springs into action whenever a criminal is at last about to suffer for a crime. It may be a sign of a tender heart, but it is also a sign of one not under proper regulation. Society demands that crime shall be punished, and criminals warned, and the false humanity that starts and shudders when the axe of justice is ready to strike is a dangerous element for the peace of society." The Court went on to say, "We have had too much of this mercy. It is not true mercy. It only looks to the criminal, but we must insist on mercy to society." And if your Honor please, the Court went on to hold, and in that case, that for criminals

---

to support the finding of death. If no aggravating circumstance is found, death may not be imposed. If an aggravating circumstance does exist, the jury may exercise its discretion in choosing between life imprisonment and death as the appropriate punishment. *See Zant v. Stephens*, 250 Ga. 97, 297 S.E.2d 1 (1982). In

this case, the jury found two aggravating circumstances to support death for the murder— (1) that the murder was committed in the course of another capital felony (armed robbery), and (2) that the offense was "outrageously and wantonly vile, horrible and inhuman." *See* Ga.Code Ann. §§ 17–10–30(b)(2) and (b)(7).

to go unpunished is a disgrace to our civilization, and we have reaped the fruits of it in the frequency in which the bloody deed occurs. They said that a "stern, unbending, unflinching administration of the penal laws, without regard to position or sex, that it is the highest mark of civilization, and it is also the surest mode to prevent the commission of offenses."

Drake claims this tactic was extremely improper. We agree.

██ Arguments delivered while wrapped in the cloak of state authority have a heightened impact on the jury. For this reason, misconduct by the prosecutor, normally an elected public official, must be scrutinized carefully. *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1934). In *Brooks v. Kemp*, we considered an argument that stressed the prosecutor's infrequency of seeking the death penalty in order to suggest that the defendant was particularly deserving of death. 762 F.2d at 1410–1411. That argument invited the jury to rely on the expertise of the prosecutor instead of exercising fully its own discretion to choose punishment. We held that argument to be improper. *See also Richard Tucker v. Kemp*, 762 F.2d 1496, 1505 (11th Cir.1985) (en banc); *Wm. Boyd Tucker v. Kemp*, 762 F.2d 1480, 1484 (11th Cir.1985) (en banc).

██ If invoking the expertise of the prosecutor is dangerous, the invocation of the Supreme Court of Georgia to abjure mercy is undeniably wrong. *Hawes v. State*, 240 Ga. 327, 240 S.E.2d 833, 840 (1977). Huff, not surprisingly, failed to mention that the cases quoted were each over 100 years old. Needless to say, each pre-dated the contemporary judicial effort to guide capital sentencing by principles drawn from the Eighth Amendment's protection against cruel and unusual punishment. In the current Georgia capital punishment regime, the sentencing jury has complete discretion to choose between life imprisonment or death after the finding of one statutory aggravating circumstance. *Zant v. Stephens*, 250 Ga. 97, 297 S.E.2d 1 (1982). Mercy may be a part of that discretion. Attributing the contrary view to the state's highest court was misleading and prejudicial. We will further consider the effect of this argument in Part IV of this section.[12]

2. Huff spoke of deterrence, expressing his belief that, although it could never be proven, the death penalty did deter crime:

> If your Honor please, there are those who do not believe in capital punishment. They say that it is not a deterrent. If your Honor please, I submit to the Court, deterrence can never be proven. I submit to the Court, the capital punishment law does deter. The capital punishment law is like the light house that stands by the sea that casts it [sic] light out on the treacherous course for the ships to pass safely through. Oh yes, if your Honor please, we can't count all the ships that that light passed its way and directs its course and makes it safely through, but it's easy to count the ships that wreck on shore that do not heed that guiding light. And I submit, if your Honor please, that it does deter.

Drake criticizes this comment as an unreliable personal opinion.

██ An attorney's personal opinion is irrelevant to the task of a sentencing jury. *Brooks v. Kemp*, 762 F.2d at 1408. Nevertheless, deterrence is a valid ration-

---

**12.** Although the Georgia Supreme Court explicitly disapproved of this same prosecutorial argument in *Hawes v. State*, 240 Ga. 327, 240 S.E.2d 833 (1977), it rejected Drake's assertion of error on the technical ground that the prosecutor continually said "if your Honor please" during his argument, and thereby addressed the argument to the court and not the jury. *Drake v. State*, 241 Ga. 583, 247 S.E.2d 57, 60 (1978). This distinction is unpersuasive and does not cure the recognized impropriety of remarks. *Drake v. Francis*, 727 F.2d 990, 996 (11th Cir.1984) (panel opinion) (accepting state's distinction would "rely on technical form over substance and would ignore the fact that the intended audience was, in fact, the jury"); *see also Potts v. Zant*, 734 F.2d 526, 535–37 (11th Cir.1984) (same). In fact, the *Drake* argument was worse than that in *Hawes*, where the prosecutor at least informed the jury that the cases quoted were over 100 years old. In *Drake*, Huff made no such remark and the clear implication of his quotation was that "this *is* the view of the Georgia Supreme Court."

ale for the imposition of the death penalty. *Gregg v. Georgia,* 428 U.S. 153, 184–87, 96 S.Ct. 2909, 2930–32, 49 L.Ed.2d 859 (1976). A jury is not barred from considering deterrence in its choice of punishment. *Brooks v. Kemp,* 762 F.2d at 1407–1408; *Collins v. Francis,* 728 F.2d 1322, 1339–40 (11th Cir.1984). Technically the phraseology avoided the expression of personal opinion ("I submit") and the content of the argument was clearly proper. We find no impropriety.

■ 3. Finally, Drake complains that Huff referred improperly to Gary Gilmore: "Gary Gilmore, if your Honor please, will never kill anyone else again."

It would have been completely proper for Huff to have argued "If Henry Drake is executed, he will never kill again." Such a comment would have been acceptable as a reference to the specific deterrence (or incapacitation) effect of the death penalty. The remark is such a tautology that it could hardly be seen as potentially prejudicial. Referring to Gilmore, a man executed near in time to Drake's trial, was not improper. Read in context, the argument did not invite an unfair comparison between the two men.

## IV. WAS DRAKE'S SENTENCING HEARING FUNDAMENTALLY UNFAIR?

The only improper argument at Drake's sentencing was the use of old Georgia Supreme Court cases to suggest that mercy was an inappropriate consideration for Drake. Because the improper argument focused solely on the propriety of mercy, we do not believe that it influenced the finding of aggravating circumstances.[13] We must, however, determine whether there was a reasonable probability that the improper argument changed the jury's exercise of discretion in choosing between life imprisonment and death. *See Brooks v. Kemp,* 762 F.2d at 1408–1409 (Georgia sentencing jury has two tasks; arguments infringing upon either may require relief).

■ As our previous discussion shows, the extended quotation was misleading, legally incorrect and prejudicial. Huff neglected to inform the jury that the quoted cases were over 100 years old. Thus, the jurors would probably have understood the quotations to reflect contemporary "law" in the state. Huff's argument constituted an affirmative misrepresentation of the law. Following the finding of an aggravating circumstance, the jury is granted full discretion to impose life imprisonment or death. Just as retribution is an appropriate justification for imposing a capital sentence, *Brooks v. Kemp,* 762 F.2d at 1407, a jury may opt for mercy and impose life imprisonment at will. The ultimate power of the jury to impose life, no matter how egregious the crime or dangerous the defendant, is a tribute to the system's recognition of mercy as an acceptable sentencing rationale.

To state that mercy towards a defendant in a capital case contravenes the law or is frowned upon by the Supreme Court of Georgia strikes at the core of the jury's role in capital sentencing. Huff's claims that mercy is "sickly sentimentality," "false humanity," and a "dangerous element for the peace of society," were fundamentally opposed to current death penalty jurisprudence. Thus, the suggestion that mercy is inappropriate was not only a misrepresentation of the law, but it withdrew from the jury one of the most central sentencing considerations, the one most likely to tilt the decision in favor of life.

Finally, the remark's prejudice exceeded even its factually misleading and legally incorrect character because of the attribution to the Georgia Supreme Court. Absent the attribution, the claim would have been severely prejudicial. Telling the jurors that the sentiment was that of the highest court in the state created a severe danger that they would defer to such an expert legal judgment in their choice of penalty.[14] Even though this was the sole

---

**13.** The aggravating circumstances found in this case are discussed at note 11, *supra.*

**14.** In its general charge, the trial court did briefly instruct the jury that it could consider facts in mitigation, defined as not constituting justifica-

impropriety in Huff's closing, it is extremely disturbing.

In considering this argument in light of the facts of this case, we conclude that Drake has shown a "reasonable probability" that this improper remark caused the death verdict. While the evidence of a vicious attack on Eberhart was overwhelming, the evidence to implicate Drake was not. *See Brooks v. Kemp*, 762 F.2d at 1402 n. 27 (recognizing that it is appropriate in this context to consider weakness in the evidence of guilt since an important aspect of the jurisprudence is to minimize the risk that an innocent person will be executed); *see also, Strickland v. Washington*, — U.S. —, —, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674, 699 (1984) ("a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support"). The state's case against Drake was made almost completely by codefendant William Campbell, who was trying to deny his own involvement in the crime.[15] Drake did have witnesses supporting his alibi. The jurors deliberated at length before finding Drake guilty, and the court's felony-murder and aiding and abetting instructions make it impossible to know how they viewed Drake's involvement in the murder itself. Under all the circumstances of this case, Huff's extremely improper use of the century-old Georgia Supreme Court cases to suggest the impropriety of mercy "undermine[s] confidence in the outcome" of his sentencing proceeding.[16] *Strickland v. Washington*, — U.S. at —, 104 S.Ct. at 2069, 80 L.Ed.2d at 698. We conclude that the improper argument rendered Drake's sentencing proceeding fundamentally unfair.

For the foregoing reasons, Drake is entitled to relief with respect to the sentencing phase on his prosecutorial argument claim.

## SECTION THREE: CONCLUSION

For the reasons stated in Section One, the judgment of the district court denying habeas corpus relief on the *Sandstrom* issue is REVERSED. The case is REMANDED to the district court with instructions to grant the writ of habeas corpus, conditioned upon the state's affording Drake a new trial.

For the reasons stated in Section Two, the judgment of the district court denying habeas corpus relief on the prosecutorial argument issue is REVERSED.

With respect to the issue whether the trial court's instructions at sentencing properly informed the jury of their absolute discretion not to impose death, we reinstate the panel opinion AFFIRMING the district court's denial of habeas corpus relief.[17]

## APPENDIX A

### CHARGE TO THE JURY

Ladies and gentlemen of the jury, in this case of the State versus Henry Drake, the Grand Jury of this County has returned an indictment against Henry Drake, charging him with the offenses of murder and armed robbery. And the charges as expressed in the language of the indictment is, in substance, as follows:

> despite the lack of an objection. This kind of remark was so improper that the trial court should itself have interrupted and stopped the prosecutor. ABA Standards for Criminal Justice, 3–5.8(e) (1980) ("It is the responsibility of the court to insure that final argument to the jury is kept within proper accepted bounds").

---

tion or excuse, but which in fairness or mercy may be considered in extenuation. Although helpful, we do not view this as curing the strongly improper impact of Huff's argument.

**15.** Campbell later recanted his testimony and claimed to have committed the crime himself. The recantation was the basis of Drake's extraordinary motion for new trial which was rejected. *Drake v. State*, 248 Ga. 891, 287 S.E.2d 180, *cert. denied*, 457 U.S. 1111, 102 S.Ct. 2915, 73 L.Ed.2d 1322 (1982).

**16.** We find the remark so serious under the circumstances of this case that we consider it

**17.** We decline to reach the other issues on appeal, exercising our discretion not to do so in light of our resolution of the case granting relief on other grounds.

"The Grand Jurors selected, chosen, and sworn for the County of Madison, to wit," and then names them, "in the name and behalf of the citizens of Georgia, charge and accuse Henry Drake of the county and state aforesaid with the offense of armed robbery. For the said Henry Drake, on the 5th day of December in the Year of Our Lord, 1975, in the county aforesaid, did then and there, unlawfully, and with force and arms, with the intent to commit theft, took from the person of and in the immediate presence of C.E. Eberhart the following property, to wit: $300 in cash—of the value of $300—and one Timex men's watch of the value of $10, both of said properties being the property of C.E. Eberhart, by the use of a certain claw hammer and a certain knife, the same being offensive weapons, contrary to the laws of this state and the good order and peace and dignity thereof.

"Count 2: And the Grand Jurors aforesaid, on their oath aforesaid, in the name and behalf of the citizens of Georgia, further charge and accuse the said Henry Drake with having committed the offense of murder, for the said accused in the county aforesaid did then and there, unlawfully, and with force and arms, and with malice aforethought, kill and murder C.E. Eberhart, a human being, by beating and hitting him about his head and body with a certain claw hammer, and by stabbing him with a certain knife, on the 5th day of December, 1975, at which time a mortal wound and wounds were inflicted upon the said C.E. Eberhart by the said accused in the aforesaid manner of which said wound and wounds of said C.E. Eberhart died on the 21st day of March, 1976, contrary to the laws of said State, the good order, peace, and dignity thereof."

Now ladies and gentlemen of the Jury, to this indictment the Defendant has filed and entered his plea of "not guilty." Neither the indictment nor the Defendant's plea of "not guilty" are evidence and are not to be regarded as evidence. Together, however, they frame the issues which you are to decide and determine.

The Defendant enters upon the trial of this case with the presumption of innocence in his favor, and that presumption remains with him throughout the trial until and unless the State carries the burden of proving the material allegations of this indictment beyond a reasonable doubt. In determining whether the State has carried this burden, you will consider all of the evidence which has been introduced here during the trial before you. Now ladies and gentlemen, a reasonable doubt means exactly what it says. It is a doubt based on reason and for which a reason can be given. A reasonable doubt may arise through a consideration of the evidence or because of a lack or insufficiency of the evidence. A reasonable doubt is not a vague or conjectural doubt, it is not an imaginary or arbitrary doubt, and it is not a capricious or fanciful doubt. Neither does it mean a possibility that the Defendant may be innocent, but it means a doubt for which a specific reason can be given. Now while the law requires the State to prove the Defendant's guilt beyond a reasonable doubt yet the law does not require the State to prove the Defendant's guilt to an absolute or mathematical certainty.

Now ladies and gentlemen, in a criminal case, which this is, the law makes you the judges of the facts and the law. The facts you obtain from the evidence produced to you throughout this trial. The law you obtain from the Court as given you in Charge. I instruct you that any verdict that you may render in connection with the matter now before you for determination should be arrived at from these facts and as you find them to be, applying those facts to the law as given you in Charge by this Court.

Now ladies and gentlemen of the Jury, you are made by law the exclusive judges of the credibility of the witnesses and the weight you shall give their testimony. That applies to all the witnesses in this case. In determining their credibility, you may consider all the facts and circumstances of the case. You may consider the witnesses' manner of testifying. You may consider their intelligence. You may con-

sider their means and opportunity they had of knowing the facts to which they testified. You may consider the nature of the facts to which they testified. You may consider the probability or improbability of their personal credibility insofar as the same may legitimately appear from the trial of this case. The law also directs, ladies and gentlemen, that it shall be your duty to so reconcile all conflicting testimony, if there is such in this case, whenever it can be done so, that all the witnesses may be made to speak the truth, and perjury impuded or attributed to none. But if there is any testimony in this case which is in such irreconcilable conflict that this cannot be done, then it would be your duty to believe the evidence which seems most reasonable and believable to you, considering all the facts and circumstances of the case.

Now ladies and gentlemen, I charge you that to impeach a witness is to show to the satisfaction of the Jury that such witness is unworthy of belief. A witness may be impeached by disproving the facts testified to by him or her, or by proof of contradictory statements previously made by him or her as to the matters relating to his or her testimony and to the case. When a witness shall have been successfully contradicted as to a material fact, his or her credibility as to other matters shall be for you, the Jury, to determine; but if a witness shall swear willfully and knowingly falsely, you have the right, though not the duty, to reject his or her testimony in its entirety unless you find his or her testimony to be corroborated by other unimpeachable evidence. The credit to be given to a witness's testimony, where impeached for contradictory statements out of Court, shall be for you, the Jury, to determine, the credibility of witnesses being a matter always to be determined by the Jury under proper instructions from the Court. If an effort has been made to impeach a witness or witnesses, that would be for you—either in-Court statements or otherwise—that would be for you to determine. In the final analysis, ladies and gentlemen of the jury, the weight and credibility to be given any evidence is a question for you, the Jury, to determine.

Now ladies and gentlemen of the Jury, I charge you that the Defendant in this case has introduced evidence tending to show that he was not present at the time and place of the commission of the alleged offense for which he is here on trial—offenses. If, after the consideration of all the evidence, you have a reasonable doubt that the Defendant was present at the time the crime or crimes was or were committed, he is entitled to an acquittal.

Ladies and gentlemen, I charge you that a criminal intent is a material and necessary ingredient in any criminal prosecution. I charge you that the acts of a person of sound mind and discretion are presumed to be the products of a person's will and a person of sound mind and discretion is presumed to intend the natural and probable consequences of his act, but both of these presumptions may be rebutted. I charge you, however, that a person will not be presumed to act with criminal intent but the trials of fact may find such intent from consideration of the words, conduct, demeanor, motive, and all other circumstances connected with the act to which the accused is here prosecuted. You are the triers of the facts; therefore, it is a question of fact solely for your determination as to whether or not there was a criminal intent on the part of the Defendant, considering the facts and circumstances as disclosed by the evidence and deducting the deductions which might reasonably be drawn from these facts and circumstances. Now while a criminal intention may be proven in more than one way, the question of whether the Defendant did act with criminal intention is finally and always a question for you, the Jury, to determine.

Now ladies and gentlemen of the Jury, one of the offenses charged in this indictment is that of murder. I charge you that a person commits murder when he is unlawfully and with malice aforethought, either express or implied, causes the death of another human being. Express malice is that deliberate intention to take away the life of a fellow creature, which is manifest by external circumstances capable of proof. Malice shall be implied where no considera-

ble provocation appears and where all the circumstances of the killing show an abandoned and malignant heart. Legal malice is not necessarily ill will or hatred. It is the intention to unlawfully kill a human being without justification or mitigation, which intention, however, must exist at the time the killing was alleged; but it is not necessary for that intention to have existed for any length of time before the killing. In legal contemplation, a man may form the intention to kill a human being, do the killing instantly thereafter, and regret the deed as soon as it is done. In other words, murder is the intentional killing of another human being without justification or mitigation.

Now I charge you further that a person commits the crime of murder when in commission of a felony he causes the death of another human being irrespective of malice. I charge you that if you believe, beyond a reasonable doubt, that any time before this Bill of Indictment was returned and filed with this Court by the Grand Jurors named therein, that this Defendant on trial did kill the person named in the indictment in the manner as alleged and that this killing was with malice aforethought, either express or implied, and further that the intention to kill such person was present as a necessary ingredient to such crime, then you would be authorized to find the Defendant guilty of murder as charged. On the other hand, if you have a reasonable doubt as to the Defendant's guilt of the offense of murder, then it would be your duty to give him the benefit of that doubt and acquit him insofar as the charge of murder is concerned. I charge you that if you find beyond a reasonable doubt that the Defendant committed the homicide alleged in this Bill of Indictment at the time he was engaged in the commission of a felony, to wit, armed robbery, you would be authorized to find him guilty of murder. In this connection, I charge you that in order for a homicide to have been done in the perpetration of this particular felony, there must be some connection between the felony and the homicide. The homicide must have been done in pursuance of the unlawful act and not collat-eral to it. A homicide is committed in the perpetration of a felony when it is committed by the accused while he is engaged in the performance of any act required for the full execution of such felony. I charge you that if you find and believe beyond a reasonable doubt that the homicide alleged in this indictment was caused by the Defendant while he, the said accused, was in commission of a felony, as I have just given you in Charge, you would be authorized to convict the Defendant of murder; and this you would be authorized to do whether the Defendant intended to kill the deceased or not. A homicide, though unintended, if committed by the accused at the time he is engaged in the commission of some other felony, constitutes murder.

Now I charge you further that in regard to armed robbery: a person commits armed robbery with the intent to commit theft; he takes property of another from the person or the immediate presence of another by actual use of an offensive weapon. The essential elements of the offense that the State must prove beyond a reasonable doubt are: the taking must have been with a purpose to commit a theft. It must have been against the will of the person robbed, and it must have been by open, menacing, immediate threat or use of an offensive weapon. An offensive weapon is one which if used in its usual, accustomed manner is likely to produce death. The character of a weapon as such may be established by direct or by other evidence sufficient to establish it to be an offensive weapon. If you find and believe beyond a reasonable doubt that the Defendant committed such offense, you would be authorized to find the Defendant guilty of armed robbery.

Now ladies and gentlemen of the Jury, I charge you that it is not necessary that the crime of murder be a part of the original design to commit the offense of armed robbery, but it is enough that it be one of the incidental and probable consequences of the execution of the design of the parties, and should appear at the moment to one of the participants to be the expedient, to the common purpose. In such case, the intents and acts of the actual slayer is

imputed to the other party, although he be merely present and participating in the original design and he himself does not inflict the mortal wound.

Now ladies and gentlemen, the law permits, as experts, witnesses who have had special training, knowledge and experience in certain lines, to give their opinion based upon their knowledge of particular matters. The weight which is to be given the opinions of expert witnesses is for you to decide. You may accept it and act on it or reject it and then act on your own judgment, as you apply it to the evidence in this case.

Now ladies and gentlemen, evidence is of two kinds: direct evidence and indirect or circumstantial evidence. Direct evidence is that which immediately points to the question at issue. Indirect or circumstantial evidence is that which only tends to establish the issues by proof of various facts sustaining, by their consistency, the hypothesis or conclusion claimed. The comparative rate of circumstantial evidence and direct evidence on any given issue in which they are in conflict is a question of fact for determination by the Jury, if any. To warrant a condition of circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused. When the guilt of the Defendant depends on circumstantial evidence alone, which is a matter for you to determine if it does or not, the rule is that each separate fact or issue linked in the chain of circumstances from which the deduction of guilt is sought to be drawn must be clearly proven beyond a reasonable doubt. A fact or circumstance not so clearly proven shall not be considered by the Jury as part of the chain of circumstances but should be rejected by you. The circumstance so proven must be a complete unbroken chain and must not only be consistent with the Defendant's guilt, but must exclude every other reasonable hypothesis save that of the guilt of the accused. If one or more of the circumstances relied on by the State are not so clearly proven and for that reason you reject one or more of the circumstances so relied upon, then you would imply where the remaining circumstances which you believe are so clearly proven to establish the guilt of the Defendant beyond a reasonable doubt, and are inconsistent with any other reasonable hypothesis save that of his guilt.

Now ladies and gentlemen of the Jury, I charge you that in this type case, a felony, you cannot lawfully convict upon the testimony of another person concerning the commission of the crime alone. Before a condition is authorized, the testimony of another person concerned in the commission of the crime must be corroborated and supported by proof of independent facts or circumstances which of themselves lead to an inference of the guilt of the Defendant, not only that the crime charged was committed, but that the Defendant was a person concerned with its commission. In other words, the corroboration must be not only to the effect that the crime was actually committed by someone, but also must be such as to connect the Defendant with the criminal act as a person concerned with commission of crime. The testimony of one person other than the Defendant concerned in the commissions of crime, if there be more than one in your determination, if satisfactory to the Jury, may be sufficient corroboration of the testimony of another person other than the Defendant concerned in the commission of the crime in a felony case.

Now ladies and gentlemen of the Jury, I charge you further, that every person concerned in the commission of a crime is a party thereto, and may be charged with and convicted of a commission of the crime or crimes. A person is concerned in the commission of a crime if he directly commits the crime himself or intentionally aids or abets in the commission of the crime or intentionally advises, encourages, counsels, or procures another to commit the crime or crimes. The phrase "aids and abets" comprehends any and all assistance given by acts, words, or encouragement in the commission of a criminal act, with knowledge of the criminal purpose of the perpetrator.

Now ladies and gentlemen of the Jury, I charge you further that an admission or incriminatory statement as applied to a criminal case is a statement by the Defendant made out of Court and in advance of the trial of fact, or facts pertinent to the issues are tending in connection with other facts and circumstances to prove the guilt of the accused or to disprove some defense set up by the accused. Whether the Defendant did or did not make any admissions or such statements is a question of fact for you to determine. All admission, or statements, if proved to have been made, must be scanned with care and received with great caution. They must have been made freely and voluntarily without the slightest hope of benefit or the remotest fear of injury. If not thus made, they cannot be considered by you in arriving at your verdict, and should be entirely disregarded in your deliberations. An admission or statement will not without, or of itself, authorize conviction; and before you would be authorized to convict there must be other proven facts and circumstances which corroborate the admissions and, in conjunction therewith, satisfy your minds beyond a reasonable doubt of the guilt of the accused. An admission or such statement, if there be such in this case, would be classified as circumstantial evidence.

Now ladies and gentlemen of the Jury, I charge you that a conviction must not rest upon suspicion, conjecture, or possibility of guilt. Where all the facts and circumstances of the case and all reasonable deductions therefrom present two theories, one of innocence and the other of guilt, if the Jury so finds, the Jury would be authorized to and should acquit the Defendant. On the other hand, should you find that the State has proven beyond a reasonable doubt every material allegation in one or both of the charges alleged in the indictment, in this case you would be authorized to convict if you believe this beyond a reasonable doubt.

Now I charge you: in a criminal case, the prosecution is not called upon to produce every eyewitness to the transaction. The burden which the Law places upon the prosecution is to establish the Defendant's guilt of the crime charged by competent evidence beyond a reasonable doubt. I further charge you that no presumption unfavorable to the State would arise from the failure to introduce them as witnesses.

Now ladies and gentlemen of the Jury, I charge you that the purpose of this trial, and indeed every legal investigation, is to discover the truth, and that is the purpose of this legal investigation and all other legal investigations. Now ladies and gentlemen, the ultimate question which the Court submits to you at this time is the question of the Defendant's guilt or innocence of the two crimes charged. You would not concern yourselves with any ultimate questions save that, at this time, of the guilt or innocence of the charges in the indictment.

Now ladies and gentlemen of the Jury, I charge you further that if I as Judge of this Court have said or done anything during the course of this trial which indicate to you that I had a desire or preference as to which of the parties should prevail, either the State or the Defendant, I want you to completely disabuse this from your mind. I cannot, and do not, have a desire or preference in this case as to which party should prevail. It is my duty to see that this trial is fairly presented to you, according to the Law, and leave it to you, ladies and gentlemen of the Jury, to reach a fair and true verdict that speaks the truth in this case; and I do so leave it to you.

Now ladies and gentlemen of the Jury, your verdict, whatever it may be, must be the unanimous verdict of all 12 Jurors. Now no Juror is required to surrender his or her honest opinion because an honest difference—different opinion of another Juror or other Jurors—for the purpose of reaching a unanimous verdict. Jurors should consult with one another and deliberate with a view of reaching a unanimous verdict consistent with their consciences and oath as Jurors. Each Juror must make an individual decision but only after a fair and impartial consideration of the entire case with their fellow Jurors. A Juror should not hesitate to re-examine his or her views and change his or her opinion if after

fair and impartial discussion and deliberation with other Jurors, the Juror is honestly convinced that he or she should change his or her opinion. Every effort consistent with the instructions I have just given you, and with your consciences and oath as Jurors, should be fairly and honestly made to reach a unanimous verdict in this case. However, this is not to say that you should surrender your conscientious convictions as an individual. This case, ladies and gentlemen, must be decided by some Jury, selected in the same manner as this Jury was selected, and there is no reason to believe that a better qualified Jury than yourself would ever be chosen.

Now ladies and gentlemen of the Jury, the Court further charges you that your duty at this time is to go to your Jury Room; make no deliberation concerning this case until the Court sends you word to start. Until that time, you will be under the same instructions as the Court has previously given you when you were at recess. When the Court sends you instructions to start deliberations, then you may do so, but not until that time. After you've started your deliberations, the first thing that I would suggest that you do is to elect a foreman. After that, the evidence, the documentary items will be brought in to you, and after that you may begin your deliberation.

Now ladies and gentlemen of the Jury, in regard to impeachment of witnesses, I further charge you that a witness may be impeached by prior convictions of the witness of a felony.

Now ladies and gentlemen of the Jury, I charge you that the form of your verdict in this case will be, as to Count 1 "We, the Jury, find the Defendant," either "guilty" or "not guilty of Count 1." And I charge you that the form of your verdict in regard to Count 2, which is murder, is: "We, the Jury, find the Defendant guilty," or "not guilty of Count 2." You will date it and let your foreman sign it. With this instruction, Mr. Bailiff, take them to the Jury Room.

Ms. McGinnis has served as an alternate Juror in this case and we appreciate it very much and I wish I could say you could go home, but I'm going to have to ask Mr. Seagraves to find you a place to sit and make yourself comfortable. You can't go with the Jury but you will have to go to another place and not have any discussion with anybody.

JAMES C. HILL, Circuit Judge, specially concurring:

I concur in the judgment of the court because the instruction in this case violated the rule articulated by this circuit in *Davis v. Kemp,* 752 F.2d 1515 (11th Cir.1985) (en banc), and by the Supreme Court in *Francis v. Franklin,* —— U.S. ——, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). I reiterate my view that *Davis,* and now *Franklin,* represent new rules of law extending the case of *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) to a set of facts with which that case was unconcerned. *See Davis,* 752 F.2d at 1522 (Hill, J., dissenting).

I also conclude that the error occasioned by this impermissible burden shifting instruction was not harmless, but I believe the analysis by which the court reaches that conclusion to be redundant. In determining whether an erroneous jury charge was harmless we look to see whether the jury's conclusion of guilt could have been tainted by the error. Here we deal with intent; if intent is not a question of fact there is no possibility of harm. However, the *reason* intent is not at issue—whether it was uncontested or contested in the face of overwhelming evidence—is immaterial. For this reason I believe the majority's two part formula is unnecessary and that the proper inquiry is simply whether intent was at issue in the case.

I further concur in section two of the majority's opinion holding prosecutorial remarks made during the sentencing phase of Drake's trial were fundamentally unfair in violation of *Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). I do so because I agree that "[t]he only improper argument at Drake's sentencing was the use of old

Georgia Supreme Court cases to suggest that mercy was an inappropriate consideration for Drake." Majority Op. Slip op. at 4590, at 1460. In light of the extensive history of litigation on this single issue, both in state and federal courts, I consider it not entirely inappropriate to make the following observation.

In this country, trials are conducted through the adversarial system. When that system operates properly, one of the advocates is inhibited from overreaching by well-founded apprehension that the other advocate may, by skill, seize the overstatement and turn it upon its author. Had the adversarial system functioned properly when a prosecutor first resorted to quotations from *Eberhart*,[1] the courts of Georgia would probably have heard that argument no more.[2] The prosecutor, welding his case to the *Eberhart* opinion before a jury in a deep South Georgia county could have been made to regret that choice—for his case and, perhaps, his political future.

An adversary who had done his homework would have found that the *Eberhart* opinion was written by Georgia Supreme Court Justice Henry Kent McCay (pronounced, I am told, 'McCoy'). Some jurors in a Georgia courtroom might have taken an interest in just how McCay reached the State's Supreme Court, where he wrote denouncing the mercy he had observed in the character of Georgians.

McCay was a native of Pennsylvania who moved to Georgia after graduating from Princeton. Although he served in the Confederate Army, and was wounded, he displayed what an advocate might have termed opportunism when the conflict ended. Georgia was defeated. The political opportunities available at that time were not for those who stood by defeated and resentful comrades; they were found only in the military reconstructionist government. McCay lingered not long among his people. He embraced the reconstruction party, joining Georgians called "scalawags"[3] by their fellows. He was rewarded with an important post in the Constitutional Convention of 1868 in which no Georgian who did not join the perceived oppressors was permitted to serve. Indeed, McCay chaired that convention's committee on the judiciary, and it was not unexpected that the new government's first governor, Rufus Bullock, appointed McCay to the new Georgia Supreme Court.

In that high office McCay saw to the complete control of the military government over Georgia—and it was there that he wrote his opinion in *Eberhart*, deploring and denouncing mercy typical of the citizens of that state. It was of this Supreme Court that the Atlanta Constitution was later to say, "Judas Iscariot and Benedict Arnold would blush if compared" to these.

When defense counsel had completed that short history course, might not he have said something like

I am not surprised that these words on mercy were written by 'Justice' McCay who came to high office only with the backing of the merciless bayonets of the oppressor. But I am astounded and outraged that these words should be quoted here, gleefully, by our Solicitor, elected by the people of our county, as a state-

---

1. *Eberhart v. State,* 47 Ga. 598 (1873).

2. Unfortunately, such has not been the case. *See Young v. Kemp,* 758 F.2d 514 (11th Cir. 1985); *Potts v. Zant,* 734 F.2d 526 (11th Cir. 1984), 575 F.Supp. 374 (N.D.Ga.1983); *Drake v. Francis,* 727 F.2d 990 (11th Cir.1984). *See also Wilson v. State,* 246 Ga. 62, 268 S.E.2d 895 (Ga.1980); *Zant v. Campbell,* 245 Ga. 368, 265 S.E.2d 22 (Ga.1980); *Hardy v. State,* 245 Ga. 272, 264 S.E.2d 209 (Ga.1980); *Bowen v. State,* 244 Ga. 495, 260 S.E.2d 855 (Ga.1979); *Ruffin v. State,* 243 Ga. 95, 252 S.E.2d 472 (Ga.1979); *Drake v. State,* 241 Ga. 583, 247 S.E.2d 57 (Ga. 1978); *Potts v. State,* 241 Ga. 67, 243 S.E.2d 510 (Ga.1978); *Lamb v. State,* 241 Ga. 10, 243 S.E.2d 59 (Ga.1978); *Presnell v. State,* 241 Ga. 49, 243 S.E.2d 496 (Ga.1978); *Hawes v. State,* 240 Ga. 327, 240 S.E.2d 833 (Ga.1977); *Jackson v. State,* 219 Ga. 819, 136 S.E.2d 375 (Ga.1964); (approving the reading of *Eberhart* ).

3. Scalawag has acquired a dictionary definition: "Scalawag" n. [origin unknown] 1: rascal, scamp, reprobate; 2: an animal of little value, esp. because of poor feeding, smallness, or age; 3: a white Southerner acting as a Republican in the time of reconstruction after the Civil War. See also "scalawagery," n. the conduct or doings of a scalawag.
Websters Third New International Dictionary (1971).

ment of the sort of people you ought to be!"

Then he might say, softly, "remember the man the prosecutor quotes when you vote in the jury room—and perhaps, in our next election."

The adversarial system did not, however, work to nip this prejudicial argument in the bud. It has, oddly, remained for a federal court to silence Justice McCay's opinion in Georgia's courtrooms.[4]

KRAVITCH, Circuit Judge, concurring:

I concur in Part One of the majority opinion holding that the instruction constituted a *Sandstrom* violation and was not harmless error.

I concur in the result only of Part Two, holding that the prosecutor's argument rendered the sentencing phase of the trial fundamentally unfair and was not harmless error under *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). I do not agree, however, with the use of the *Strickland v. Washington* test in this context.

JOHNSON, Circuit Judge, specially concurring:

Although I concur in the result reached in this case, I write separately to emphasize my belief that it can be reached by a more direct route than that selected by the majority. The majority finds that the *Sandstrom* error cannot be harmless because the jury returned a general verdict on a defendant indicted on three theories of murder, and as to one of those theories—aiding and abetting—the evidence of intent was not "overwhelming." This complicated inquiry into multiple theories of liability becomes necessary because of a premise

adopted by the majority at the beginning of its argument: that "evidence of intent [can be] overwhelming, even where there is conflicting evidence as to whether the defendant was the killer." 762 F.2d at 1454. This premise, which forecloses the more straightforward holding that the evidence was not "overwhelming" as to the malice murder charge, was first introduced by the majority in *Davis v. Kemp,* 752 F.2d 1515 (11th Cir.1985) (en banc). I rejected this approach when it was presented in *Davis,* and I find here, as well, that it provides an unsuitable basis on which to build the majority opinion.

The *Davis* majority stated that "[a]lthough some opinions talk in terms of overwhelming evidence of guilt ... the crucial inquiry relates to whether or not there is overwhelming evidence of intent." 752 F.2d 1521 n. 10. The consequence of this understanding was that the Court was able to limit itself to the inquiry of whether the evidence that "whoever killed the victim did so with intent" was overwhelming, 752 F.2d 1521, without considering the weight of the evidence that Davis was the killer. This consequence is elevated to the status of a rule in the majority opinion in this case: a court can find "overwhelming" evidence of intent even where there is no "overwhelming" evidence that the defendant was the individual who committed the act. The flaw in this new rule is the same as that in *Davis:* while it is necessary to limit the court's scrutiny to evidence of *intent,* because the jury's determination of intent is the only one that could be affected by the erroneous instruction, it is also necessary to limit the court's scrutiny to evidence of the *intent of the defendant* because it is *his* connection with the crime that is to be tested at trial.[1] If a court

---

**4.** I have suggested defense counsel's view of Justice McCay. In fairness, it should be observed that he was an able and distinguished jurist who can well be seen as one who strove mightily to lead his state through the perils of a trying time. Those interested in further information about this complex man are referred to an excellent article by the late Alexander Lawrence of the Savannah Bar and Judge of the U.S. District Court for the Southern District of Georgia, *Henry Kent McCay—Forgotten Jurist,* Georgia Bar Journal 5 (1946–47) reprinted in *Cleo*

*and the Courts: Tapping the Historical Resources of the Southern Federal Judiciary 1789–Present* 185 (1984).

**1.** Although the Supreme Court in *Francis v. Franklin,* —— U.S. ——, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985) concluded that it was evidence of *intent* rather than evidence of *guilt* which must be "overwhelming," the Court neither considered nor affirmed the further conclusion that evidence of intent may be overwhelming where evidence that the defendant was the

evaluates the evidence of the killer's intent without simultaneously evaluating evidence that the defendant is the killer, it may finish by evaluating evidence wholly inapplicable to the suspect on trial. Efforts to render such evidence applicable retroactively, on the ground that the jury ultimately found that the defendant committed the act, are also inappropriate. A court reviewing for *Sandstrom* violations must know the strength of the evidence presented at trial, so it can assess the effect of an instruction delivered at the trial's conclusion. If the evidence presented at trial is reinterpreted in light of conclusions reached by the jury in its verdict, the effect of the erroneous instruction on the jury's deliberations cannot be accurately gauged. Moreover, a rule which made all inculpatory evidence retroactively applicable to the defendant whenever the jury reached a guilty verdict would render the evidence "overwhelming" in every case in which such a verdict had been reached. *Davis v. Kemp, supra,* 752 F.2d at 1528 n. 1. (Johnson, J., dissenting).

I would hold that, because evidence of Drake's intent to commit the murder was not overwhelming, the *Sandstrom* error was not harmless beyond a reasonable doubt when measured by the rule of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

CLARK, Circuit Judge, specially concurring:

I concur in section one of the majority opinion which holds that the instruction on intent at Drake's trial improperly shifted the burden of proof in violation of *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) and that the *Sandstrom* error was not harmless.

I also concur in section two of the majority opinion which holds that Drake is entitled to a new sentencing hearing because of prosecutorial misconduct in closing argument at the penalty phase of Henry Drake's trial.[1] I write separately only to point out what I believe to have been the most fundamental and egregious error committed by the prosecution at Drake's trial; the utilization of a theory of the Eberhart murder which was totally inconsistent with the state's view of the crime presented at the trial of William Campbell. Despite the other errors which mandate that Drake be retried, I believe it is important to address this claim. The prosecutor's totally inconsistent theories of the same crime at William Campbell's and Henry Drake's respective trials transgressed the Fourteenth Amendment's requirement that a criminal trial be fundamentally fair.

## I. FACTS

In order to put Henry Drake's legal claims into proper perspective, it is necessary to examine what we know and do not know of the circumstances surrounding the death of Mr. Eberhart, the state trials of William Campbell and Henry Drake and events that have since come to light.

On the evening of December 5, 1975, the Defendant, Henry Drake, his girlfriend, Mary Carruth, and William Campbell, a friend who was living with Drake and Carruth at the time (TT 157–159),[2] drove from Madison, Georgia, where the three were living, into Colbert, Georgia where Henry Drake's mother and other family members

---

killer is not. In fact one standard applied by the Court in its harmless error analysis (requiring "evidence so dispositive of intent that a reviewing court can say beyond a reasonable doubt that the jury would have found it unnecessary to rely on the presumption" (*citing Connecticut v. Johnson,* 460 U.S. at 97 n. 5, 103 S.Ct. at 973 n. 5 (Powell, J., dissenting)), —— U.S. ——, 105 S.Ct. at 1977, provides additional support for the proposition that none but the most comprehensive and compelling evidence of intent would be sufficient to render a *Sandstrom* error harmless. While the question remains to be addressed by the Court, it seems unlikely that

the evidence would be construed to meet this elevated standard where it failed overwhelmingly to establish the identity of the killer.

1. However, as I specially concurred in *Brooks v. Kemp,* 762 F.2d 1383 (11th Cir.1985), I cannot totally concur in the majority's reasoning.

2. TT refers to the trial transcript from Henry Drake's state murder trial. Drake and Campbell had met while both were inmates at the state penitentiary in Reidsville. Campbell came to live with Drake and Carruth after he was released from prison.

lived (TT 407). The defendant and his girl-friend dropped Campbell off across the street from the barbershop in Colbert so that he could get a haircut (TT 161–162, 360, 409) and then continued on to the house of the defendant's mother (TT 410–411).

At about 5:00 p.m. Campbell was observed leaning on a car outside the barbershop (TT 283–284). At 6:00 p.m. he was no longer outside but the lights in the barbershop were on (TT 284).

At 9:00 p.m. that evening C.E. Eberhart, age 74, was found critically wounded on the floor of his barbershop (TT 290). He had received blows to the head from a clawhammer and a stab wound (TT 149–150). The floors and walls of the barbershop were smeared with blood as though an extended struggle had taken place (TT 290, 307). Mr. Eberhart was hospitalized but remained in a coma until his death several months later (TT 152–155).

Several days after the attack on Mr. Eberhart law enforcement officers went to the home of Defendant Drake, where Campbell had been staying, to search for Campbell and possible evidence (TT 122, 309, 358, 360). At that time Henry Drake was not considered a serious suspect in the Eberhart incident. Campbell was gone but a watch later identified as belonging to Mr. Eberhart was found in Campbell's room in a dresser along with Campbell's clothes and papers (TT 129, 133, 322). Campbell was arrested by Georgia authorities after he was located in Virginia. Only one week after the attack on Mr. Eberhart he had been arrested by Virginia police for shooting a woman during a robbery (TT 195, 197). Subsequently and only after being implicated by Mr. Campbell, Henry Drake was also arrested.

Drake was originally indicted along with Campbell, but due to a challenge to the grand jury made by Drake's appointed attorneys he was reindicted and his case did not go to trial until one year after Campbell had been tried and convicted and sentenced to death for the murder and armed robbery of Mr. Eberhart.

## A. *William Campbell's Trial*

At his own trial Campbell claimed that he was getting a haircut from Mr. Eberhart when Drake came in and began beating the barber over the head with a hammer. Campbell testified that he tried to stop him but that Drake also struck him with the hammer when he did so (CTT 317).[3]

The jury obviously disbelieved Campbell's version of the events as it convicted him of both the murder and armed robbery of Mr. Eberhart, and recommended the death penalty for the murder. *See Campbell v. State,* 240 Ga. 352, 240 S.E.2d 828 (1978) *cert. denied,* 439 U.S. 882, 99 S.Ct. 218, 58 L.Ed.2d 194 (1978).[4]

In his argument to the jury the prosecutor stated:

I think this evidence reflects and you can so find that Drake was pretty well known around Colbert and Campbell was to be the man to case the joint. I have no doubt in my mind that he probably helped Mr. Eberhart sweep the floor and he probably left and waited around and came back, probably real close, where he waited around there and then came back and Mr. Eberhart was fixing to close and Mr. Eberhart opened that door back up and letting them in. I think that right there is probably when he stuck that knife in him and that is when the struggle began. Yes, he is not as big a man as Mr. Eberhart and that is why they had one hellacious struggle. He was drinking, and his adrenalin glands were working, because he was smaller, and that is why he took the knife and stuck it in him and it weakened the old man and they fought.... Now, who did it, Campbell, Drake, and you know what I say on this

---

**3.** CTT refers to the trial transcript of William Campbell's state trial.

**4.** The Georgia Supreme Court apparently believed that Campbell was the murderer as well.

In its proportionality review of his sentence, that court stated: "The evidence shows that the appellant mercilessly bludgeoned an elderly man eventually to his death with a claw hammer." 240 S.E.2d at 832.

evidence, does it really matter which one, or the two, or if they were in it together. *It is my thoughts on this evidence that this is the actual slayer, Mr. Campbell is, of Mr. Eberhart,* because you see that no one knew who Campbell was, except some of the Deputy Sheriffs and very few people. You see Campbell told the GBI agent, "Yeah, I threw the hammer." Now, why would he tell this, because he knew that he had handled that hammer and he felt like that there might be a fingerprint on it, and that was the way he was covering his tracks, to say that, Yes, I handled the hammer. The Barber Tools, he also stated that he handled those also, and he was covering his tracks again. Would you look at those poor little old barber tools. Who on earth would kill a man for a few little old barber tools. Look at that. Here they are, didn't have anything, didn't work for anything. He is the guy that would do a thing like this, to pick up those tools and carry them out of there with him, this garbage and I submit in a case of this nature that that is all that is, is garbage, that any man that would carry those little clippers out of there. Anyone that had gone through all of this and kill somebody and had to wash up and all, who after getting the money would take the time to stop to steal a few little old barber tools, except someone like William (Bill) Campbell that you have ever seen, nobody, nobody. You know the first thing we have to do is that we have to get the defendant present and put a motive in there and then we put him running. *Campbell admits the entire case against him except that he didn't do it, that Drake did it. I don't believe that you ladies and gentlemen are going to buy that kind of story and say that, "You are right", and set him free.* What would he say on Drake's trial? ... They are both a part of this crime of robbery and murder and there is no mistake about it, under the evidence.

(CTT at 343–44) (emphasis added). At the penalty phase of Campbell's trial the prosecutor continued:

Your honor, please, there is one person who believes in capital punishment, and that is the murderer. He believes in capital punishment. He believes in it without a Judge or Jury or a public hearing where the friends and relatives of the victim and the public can attend. This Defendant believes in it for he similarly killed his victim, and then went to Virginia and attempted to do the same thing.

(CTT at 385).

### B. *Henry Drake's Trial*

Despite the jury's rejection of Campbell's account of the crime, one year later the State called him as its key witness in the trial of Drake and had him reiterate this same story (TT 167–70, 188). In Drake's case, the state argued that "[he] Drake must have been the one who actually beat the victim" due to Campbell's poor health. *Drake v. State,* 241 Ga. 581, 247 S.E.2d 57 (1978) *cert. denied,* 440 U.S. 928, 99 S.Ct. 1265, 59 L.Ed.2d 485 (1979).

William Campbell was the only witness in Henry Drake's trial who implicated Drake in the murder and robbery of Mr. Eberhart; and his testimony was strikingly different from the account given by the other witnesses at trial.

Henry Drake and Mary Carruth both testified that after dropping Campbell off for his haircut, they drove to Drake's mother's house where they had supper and visited for about two hours (TT 381–82, 410). Drake's mother, brother and brother-in-law all confirmed that Henry and Mary were at Drake's mother's that evening (TT 429, 432, 434). Drake and Mary Carruth further testified that they picked Campbell up across the street from the barbershop on their way out of town and that he told them that he had been in a fight with the barber (TT 352, 422).

Drake testified that about 3:00 a.m. that night Campbell woke him and wanted Drake to drive him back to Colbert because he left his knife and some barber clippers he took from Mr. Eberhart there. [Barber tools were found outside the barbershop (TT 366).] Drake refused to take him (TT

412, 413). The next day, Drake went back to his mother's in Colbert in order to borrow a radio. It was then he found out the extent of Eberhart's injuries. When he got back to Madison, he told Campbell how badly Eberhart was hurt. Campbell then told Drake to drive him to Atlanta (TT 414).

Campbell's testimony, which covers over 100 pages of transcript, varied significantly from that of Mary Carruth and Henry Drake. The thrust of his testimony was that Henry, and Henry alone, robbed and murdered Mr. Eberhart and that Campbell himself was merely an innocent bystander who in fact tried to help the victim. However, Campbell's story was not only difficult to believe in and of itself, it was also filled with contradictions and inconsistencies throughout.

To begin with, Campbell stated that after Drake let him out he hung around the laundromat for ten or fifteen minutes (TT 205). He then walked over to the barbershop. Mr. Eberhart was cleaning up but said he would cut Campbell's hair after he finished sweeping up, so Campbell held the dustpan for him (TT 205).

At first Campbell stated that he and Eberhart did not converse while his hair was being cut (TT 212); however, on re-cross he admitted that he asked Eberhart for a job while he was cutting his hair (TT 245) [Campbell testified earlier that he had been looking for a job in Colbert, but no one would give him one. There was also testimony that Campbell had been a barber at one time (TT 366–67).]

When the State began questioning Campbell as to the defendant's involvement in the crime, Campbell first stated that he did not see Drake in the barbershop but saw him only in front of the barbershop before and after he [Campbell] got his hair cut (TT 164–65). After considerable prodding by the District Attorney, Campbell changed his story and claimed that while he was having his hair cut, Drake came in with a black wig on [Campbell said he didn't recognize him at first], walked around behind the barber chair and hit Eberhart in the head with the hammer (TT 168).

At Drake's trial, Campbell said he watched Drake come in and walk around Eberhart. However, as Drake's trial counsel brought out on recross, at his own trial Campbell testified that he did not know Drake was there until he heard Eberhart groan twice and turned around to see Drake hitting him (TT 246). Drake's counsel also brought out on recross that Campbell did not mention any wig at his own trial (TT 243).

As to the wig, Campbell testified first that he did not know what happened to it after the beating (TT 170). Later, he testified that during the struggle Eberhart pulled the wig off Drake (TT 208, 249). Still later he said Drake wore the wig back to the car (TT 213).

On direct, Campbell said that when Henry came into the shop he told Eberhart that he was going to "rob him and take his money (TT 169)," but on cross examination, he said Drake did not say anything when he came in (TT 207).

Campbell claimed that he tried to stop Henry from hitting the old man at which time Henry hit him [Campbell] in the head with the hammer (TT 169, 208). In elaborating on being hit by Drake on cross examination, Campbell, already aware of the physical evidence the State was going to present from his own trial, related that when he was hit he fell out of the barber chair over near the door stating that "that's where they got my blood stains, off the door" (TT 208).[5] But Campbell's story of falling by the door was inconsistent with testimony he gave at his own trial that Drake picked him up and set him by the door (TT 211). This testimony from the previous trial was also inconsistent with Campbell's statement on cross that Henry did not touch him after hitting him with the hammer (TT 209).

Campbell's testimony was particularly inconsistent as to the hammer itself. The

---

**5.** The State did, in fact, present testimony of a forensic scientist that Type A blood scrapings were taken from the door frame; Campbell was typed as A, while Eberhart and Drake were typed as O.

hammer was found in the back of a pickup truck located behind the barbershop and Campbell admitted that he threw it there (TT 175), but he had several versions as to where he threw it from. First he stated only that he picked the hammer up at the barbershop and threw it toward the truck (TT 175). On cross examination, he specified that he picked the hammer up off the barbershop floor as he was going out the door (TT 215), and that he did not know where Drake had gotten it from (TT 215). However, after being asked if he had ever said that he had found the hammer in Drake's car, he changed his story and responded, "That's right. As a matter of fact, he kept it in there all the time. He worked on that old car with it (TT 214)." Defense counsel then read Campbell's testimony from his own trial in which he claimed that he found the hammer in Drake's car and threw it "out of the car (TT 216)."[6] When asked to clarify which he had done, thrown it from the barbershop or thrown it from the car, Campbell changed his story for the third time. He claimed that Drake carried the hammer out of the barbershop, laid it down, then stepped on it so that it bounced back to near the door where Campbell picked it up (TT 216). He stated that he [Campbell] hid the hammer inside the car until he could get back to the door. At this point defense counsel gave up hope of getting a straight story about the hammer from Campbell and went on to something else. But further flaws in Campbell's testimony continued to develop.

On direct, Campbell testified that after the incident in the barbershop he did not have any blood on his clothes and did not pay any attention to whether Henry had any blood on him (TT 172). But on cross and recross, he claimed that there was blood on his own shirt (TT 218, 248), saying that he threw the bloody clothes away, but then changing his story to say that Henry or Mary threw them away (TT 248–49).

On direct, Campbell testified that Mary Carruth was behind the barbershop somewhere during these events but that he did not know exactly where (TT 176). On cross, he testified that she was "at the door, beside the door ... around to the corner door," and that she "come to the door (TT 219)."

Campbell testified that he, Mary Carruth and Drake walked to the car (TT 177) which was parked up the street at the store and then drove to the cemetery and drank a beer (TT 177, 220).[7] He next testified that he went to sleep in the back seat and when he woke up they were back in Madison (TT 178). When asked, "Do you recall the next day?", Campbell responded, "No, sir, Henry [Drake] told me about [it] ... the next day."

Campbell went on to testify that the next day [Saturday] Drake told him that he [Campbell] would have to leave because the barber was expected to die (TT 179–86, 225). While being examined on direct as to this particular portion of events, Campbell was asked what Drake said. He responded, "He said they were looking for that barber to die ... was robbed that night. I didn't know about it. He told me about it (TT 184)." When questioned further about what was said, he testified that "he [Drake] told me, 'Bill, you've got to leave. I hate to say this, but you got to leave.' I asked him why, and he said, 'Well, what happened last night—they look for that old man to die—.' I was pretty well drinking and I didn't think the old man was hurt that bad (TT 185)." (Emphasis added, underlined portion is Campbell's statement to the court.)

Campbell then testified that Drake drove him to Atlanta and he [Campbell] caught a bus to Norton, Virginia (TT 179–86, 226) where he shot a woman in the hip only a week later while robbing a salvage company (TT 195, 197). Campbell pled guilty to that robbery (TT 186).

---

**6.** This version was inconsistent with Campbell's earlier statement that the car was parked up the street at the store (TT 126).

**7.** Two Miller Beer Bottles, the kind Campbell said they drank, were found at the cemetery.

Georgia law enforcement officers picked Campbell up in Virginia and returned him to Georgia to face the Eberhart murder and robbery charges. En route Campbell made the following statement regarding the Eberhart killing; *"[You] know when a fellow gets to drinking ... I didn't mean to do it." See Campbell v. State, supra,* 240 Ga. 352, 353, 240 S.E.2d 828 (1977) (emphasis added).

Campbell's criminal record at the time of Drake's trial included pleas of guilty to two counts of sodomy in 1967 (TT 197), a plea of guilty to burglary in 1967 (TT 198), a conviction for robbery in 1969 which resulted in a life sentence subsequently reduced to twelve years (TT 198), a plea of guilty to the robbery in Norton, Virginia and convictions for the robbery and murder of Mr. Eberhart in 1976 for which he received a life sentence and the death penalty (TT 187, 199). Campbell testified that in all he had spent around twenty years in jail (TT 194).

In sum, the testimony offered by the state at Drake's trial consisted of the following; an eye witness testified to seeing Campbell across the street from the barbershop at about 5:00 p.m. on the day of the crime. Blood scrapings taken from the handle of the murder weapon were found to be type A, Campbell's blood type. On the other hand, the only physical evidence associating Drake with the crime was a knife found at the scene of the crime allegedly belonging to him. No finger prints taken at the scene were matched to Drake. The only testimony to place Drake at the barbershop or to implicate him in the murder or robbery was Campbell's testimony, wholly inconsistent and contradictory testimony of an alleged accomplice who had a history of violent crime.

In closing argument in Drake's case the prosecutor, Mr. Huff, the same district attorney who prosecuted Campbell's case, stated:

Now ladies and gentlemen, I want to talk to you about one other factor. We saw Campbell; you saw him testify, and he talks like this (Mr. Huff is whispering); and the reason he talks like this is a combination of three factors. It's true he lost his false teeth and I think that probably would have helped some. The other is his extreme emphysema that he has. According to officers, that he can't walk even a distance that he doesn't tire and have to sit down and bend over and heave, because when he exerts himself to the least amount, he is exhausted. And of course, the other reason that he is so used to talking low, it's true, he has spent so many years in prison and that's the way they talk. They don't talk out loud in the prison system. They whisper. He doesn't hardly know how to talk loud, only in a whisper. And I submit to you that Mr. Eberhart, even though he was seventy something years old, that he was a big man, close to 200 pounds, in good health, vigorous, and the testimony was that he led a very active life. And you look at those pictures, and you look what a terrific scuffle took place, and I say to you that under this evidence, William Bill Campbell could not have done all that was done that night. Just that high. Just that high. And I suggest to you, under all that physical evidence, that it took more than little Campbell to have done old Mr. Eberhart in; because we can tell that the old man fought, and he fought, and he fought for his life. And Campbell would have fallen out from sheer exhaustion and emphysema long before those mortal blows would have been done.

### C. *The Recantation*

Several years after Drake was convicted and sentenced to death, William Campbell changed his story. On April 24, 1981, he gave the following affidavit:

My name is William Campbell and I was a witness in the trial of Henry Arthur Drake for armed robbery and murder. I lied at this trial. I said Henry was the one who killed the barber, Mr. Eberhart, and that I tried to stop Henry from killing him. But what I said were lies. I was the one who killed Mr. Eberhart. Henry wasn't even there. He didn't have anything to do with it.

Me and Henry were going to Colbert. Henry was going to see his mamma and

he dropped me off at the barber shop and was going to pick me up on his way back to Madison. I went to the barber shop and Mr. Eberhart cut my hair, but he messed my hair up. I tried to get him to fix it but he wouldn't. He got mad and hit me with a hammer. I pulled my knife to try to get the hammer from him. I stabbed him but the blade broke off. I got the hammer away and beat him up. I saw his watch and took it and took about $400.00 out of his pocket, too.

I left the barber shop and waited behind a laundromat until I saw Henry come back. I got in the truck. (I noticed Henry's girl friend had a bowl of Henry's mamma's soup on her lap.) I told Henry about the fight and I told him I thought I might have killed the barber. Henry had to go back to his mamma's for a few minutes. He came back out with a coat or something. Then we went back to Madison.

During the night Henry went back to Colbert to see how the man was doing. In the morning he told me Mr. Eberhart was doing real bad and I'd better leave. I asked Henry to take me to Atlanta. I gave Henry Mr. Eberhart's watch. Henry took me to Atlanta and I stayed there a few days and then took the bus to my hometown, Norton, Virginia. While I was there I robbed a pawn shop and was arrested and got twenty years for armed robbery.

While I was in jail in Virginia an officer from Georgia came to question me about the barber's murder. I figured Henry must have turned me in—told everything and where I was because the officer had the watch that I'd given Henry. I told the officer I didn't kill Mr. Eberhart. I said Henry did it and I said I tried to stop Henry. I didn't do nothing but lie. I lied about Henry because I thought Henry had done me dirty. I thought Henry had turned me in and the way Henry treated me when I came back to Georgia made me keep on lying. Henry was ugly to me at the jail and after my trial, Henry said he and his whole family were glad I got the chair.

But since being here at Jackson I've thought it over and I know it was wrong to lie and I can't go on living like this. I've changed my way of living now. I'm living better and doing right now. I know what I'm saying might hurt my own appeals but I'm not going to worry about it. I don't want to go on lying. I want to get this off my conscience and try to be forgiven by Henry and God Almighty.

I'm willing to go to court to say that I lied in Henry's trial. Also this affidavit may be used in any way that will help change the wrong that I've done.

### D. Subsequent Legal Proceedings

On the Basis of this affidavit, Drake filed an extraordinary motion for a new trial which was denied by the state trial court after an evidentiary hearing. The Georgia Supreme Court affirmed this ruling *Drake v. State*, 248 Ga. 891, 287 S.E.2d 180 (1981) reasoning that, "[t]he law is settled that a post-trial declaration by a State's witness that his former testimony was false is not a ground for a new trial." 287 S.E.2d at 182. The State Supreme Court also said that Campbell's recantation was not believable because of his trial testimony as to his poor health (that he was physically incapable of being the sole perpetrator) and the fact that his recantation [8] indicated there was not much blood in the barbershop when he left, was inconsistent with the physical evidence introduced at trial. *Id.*

After certiorari was denied by the United States Supreme Court, Drake filed a peti-

---

**8.** In addition to the affidavit, William Campbell testified at an evidentiary hearing in the state trial court regarding the new trial motion. His testimony there reaffirmed his recantation. It was at that hearing that he gave the statement regarding the lack of blood. It also must be noted that Campbell had appeals pending when he gave the affidavit and testified. His attorney at that time, Robert Beal, stated on the record that Campbell was testifying against his advice and was aware of the possible adverse consequences, i.e., prejudice to his pending legal matters and a possible prosecution for perjury. (State Habeas Transcript pp. 6–7, before Honorable William F. Grant, Superior Court of Butts County, July 7, 1981).

tion for a writ of habeas corpus in the United States District Court. The district court denied the petition without a hearing. A panel of this court affirmed that decision, *Drake v. Francis*, 727 F.2d 990 (11th Cir.1984), *vacated and rehearing en banc granted, U.S. v. Garrett*, 727 F.2d 1003 (11th Cir.1984).

## II. THE LEGAL ISSUE IN CONTEXT

A. *The Reviewing Courts Interpretation of the Two Trials.*

All of the courts reviewing the petitioner's claim of inconsistent theories of prosecution have denied relief but expressed, in varying degrees, concern about the prosecutor's actions or at the very least have noted the factual inconsistency in the theories of the case presented at the two trials. The Georgia Supreme Court on direct appeal in Campbell's case noted, "the evidence shows that the appellant mercilessly bludgeoned an elderly man, eventually to his death...." *Campbell v. State, supra,* 240 S.E.2d at 832. However, on direct appeal in Drake's case the State Supreme Court noted: "[In Drake's case, the state argued that he] Drake must have been the one who actually beat the victim [due to Campbell's poor health]." *Drake v. State, supra,* 247 S.E.2d at 59. The state habeas judge reacted as follows:

*The State did exactly what Petitioner says.* The only issue is whether the pursuance by the State of inconsistent approaches in cases of this kind violates the constitutional rights of either or both of the defendants. In support of this argument, Petitioner cites cases holding that there is a prosecutorial obligation to act in good faith and that prosecutorial misconduct can amount to a constitutional deprivation. In response, the Respondent asserts that the prosecution of the two cases was not inconsistent but conveniently moves on quickly to another subject without saying why.

*The fact is that the prosecutions were inconsistent.* The issue is whether the constitution requires that the State employ basic honesty in prosecuting those accused of crime or whether it can join in the game of seeking a result without much regard for the tactics. The Court does not make this observation lightly and recognizes that the horrible murder of the victim in these cases would likely have moved any community and any prosecutor to do whatever was necessary to bring the responsible parties to justice. *The Court seriously doubts, however, that the Constitution can stand many cases where the expedient of exacting justice overpowers completely all sense of fairplay.*

*Drake v. Francis,* Civ.Act. No. 4246, slip op. at 10–11 (Superior Court Butts County, 1981) (State habeas opinion) (emphasis added).[9]

After exhausting his state remedies, Drake renewed this claim in his federal habeas petition. The district court found no constitutional error in this claim although the court did recognize the inconsistency of the theories:

[I]n Campbell's trial the state's theory was that Drake was probably just the "pick up man." In Drake's trial, evidence was revealed that Campbell was not physically able to participate in a struggle such as the evidence indicated had occurred. The State in Drake's trial argued that Drake had to have conducted the brutal beating.

*Drake v. Francis,* Civ.Act. No. 82–99–ATH, slip op. at 8 n. 4 (M.D.Ga. Dec. 15, 1982).

The panel of this circuit that originally heard the appeal from the district court's denial of federal habeas corpus relief believed the theories were fairly consistent but noted: "Hence the only inconsistent theory proposed in the two trials was that

---

**9.** However, he went on to express his belief that Campbell's and not Drake's due process rights were violated.

In this situation, it is actually Mr. Campbell (see *Campbell v. State, supra*) and not Petitioner who has the superior right to complain about the tactics of the State because Mr. Campbell was convicted and sentenced to death by a prosecution that contended on another day that he was too old and sick and weak to commit the crime.

Campbell's prosecutor believed Campbell was the sole murderer while in Drake's case, the district attorney urged that, due to sheer physical necessity, Drake must have participated in the attack as well." *Drake v. Francis, supra,* 727 F.2d 994.[10]

A review of the record of Drake's and Campbell's trials, conducted by the same prosecutor, leads me to agree that the theories of the case developed by the state at the two trials were inconsistent but to disagree with the legal conclusion drawn from those events. In my view, the state's action in Henry Drake's trial violated the fundamental fairness requirement stemming from the due process clause of the Fourteenth Amendment.

## B. *Fundamental Fairness*

It is the duty of a prosecutor not only to convict but to seek justice. *See* A.B.A. Standards for Criminal Justice, 2d Ed. (1982) § 3–1.1(b)(c); A.B.A. Code of Professional Responsibility, E C 7–3; *see also Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). He has a responsibility to guard the rights of the accused as well as those of society at large. A.B.A. Standards, § 3–5.8(c)(d). This is so because, "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of justice suffers when any accused is treated unfairly." *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

A fair trial in a fair tribunal is a basic requirement of due process. *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965). Due process is not a technical conception with a fixed context; it has never been and perhaps never can be

precisely defined. *Lassiter v. Department of Social Services,* 452 U.S. 18, 25, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). "Fundamental fairness," as a by product of due process, is "a term whose meaning can be as opaque as its importance is lofty." *Id.* Whether or not a particular action or series of actions by a prosecutor in a criminal trial renders that proceeding fundamentally unfair is frequently a judgment that must be made by the federal habeas court after reviewing the challenged actions in light of the entire record as well as assessing the relevant precedents and the other interests at stake. *Lassiter,* 452 U.S. at 25, 101 S.Ct. at 2158.

In this case, the prosecutor's actions tainted Drake's trial. Campbell told essentially the same story in both trials, i.e. that Drake and only Drake was the murderer. In Campbell's trial, however, the prosecutor attacked that story as unbelievable and argued that Drake was merely the one who "cased" the barbershop. Having destroyed Campbell's credibility in that trial and secured one death penalty, he then called Campbell as the state's principal witness in Drake's trial in order to obtain a second one.

Initially it should be noted that clearly, without Campbell's testimony, there would not have been sufficient evidence to support a conviction. Without that testimony this court would have no choice but to grant the writ and order a new trial pursuant to *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Other than Campbell's testimony, as virtually every court to review this case has conceded, there is almost no evidence linking Drake to the crime.[11]

---

**10.** The panel also believed, as did the state habeas court, that even if there was a due process violation, it was Campbell's not Drake's rights that were transgressed.

**11.** In Georgia a defendant cannot be convicted on the basis of the uncorroborated testimony of an accomplice. O.C.G.A. § 24–4–8. The purpose of the corroboration principle is to safeguard against one person falsely maintaining that he and the defendant were accomplices to commit the crime. *Coleman v. State,* 227 Ga. 769, 183 S.E.2d 379, 381 (1971). Slight evi-

dence, either direct or circumstantial, will suffice to corroborate an accomplice's testimony. *Cole v. State,* 156 Ga.App. 228, 274 S.Ed.2d 685 (1980). However, where the corroboration of the alleged accomplice's testimony is entirely circumstantial and is of itself as consistent with innocence as with guilt, such evidence is insufficient to sustain a verdict. *Reed v. State,* 127 Ga.App. 485, 194 S.E.2d 121 (1972).

The Georgia courts have resolved this issue adversely to the petitioner. A federal habeas court, therefore, cannot review the merits of this claim. *Llewellyn v. Stynchcombe,* 609 F.2d

Second, if the prosecutor did not believe Campbell's testimony but called him anyway, then that would be constitutional error. Obviously the prosecutor either believed or did not believe Campbell. If he did believe him, then the prosecutor should not have prosecuted Campbell or, once he decided that he believed Campbell's story (if this was after Campbell's trial), he should have taken steps to correct the error. If he did not believe Campbell, then the prosecutor used testimony he thought was false in order to convict Drake, a conviction he could not constitutionally otherwise secure.

In *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935) and *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) the Supreme Court made clear that a conviction obtained through the use the prosecution of false evidence, known to be such by the state, renders the conviction void under the Fourteenth Amendment.[12] The prosecutor has a duty not only to refrain from soliciting false evidence but also a constitutional duty to correct false evidence that he does not intentionally elicit. *Giles v. Maryland*, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967). Furthermore, courts have not adopted a technical conception of "false" evidence or testimony. *Blankenship v. Estelle*, 545 F.2d 510, 513–14 (5th Cir.1977) (testimony does not have to technically be perjurious to fall within the ambit of knowing use of false testimony).

In this case it is not clear what the prosecutor actually believed. We do know, however, that at Campbell's trial he vigorously attacked Campbell's testimony as unbelievable and argued to the jury that Campbell was the actual murderer. The jury likewise necessarily thought Campbell's version of the events was false or it could not have convicted him of murder and returned a death penalty. Furthermore, we know that the prosecutor at no time, either before or after Drake's trial,

took any action that indicated he believed Campbell's story.

Therefore, all we can say for certain is that the prosecutor attacked William Campbell's testimony at his trial as unbelievable and argued that Campbell must have been the sole murderer. The jury accepted the prosecutor's version of the events as true and rendered a verdict accordingly. One year later, William Campbell was called as the principal witness in Henry Drake's trial. The conclusion seems inescapable that the prosecutor obtained Henry Drake's conviction through the use of testimony he did not believe; bringing this case under the logical if not actual factual framework of *Mooney* and *Napue*.

As the state habeas judge recognized, the prosecution's theories of the same crime in the two different trials negate one another. They are totally inconsistent. This flip flopping of theories of the offense was inherently unfair. Under the peculiar facts of this case the actions by the prosecutor violate that fundamental fairness essential to the very concept of justice. *Lisenba v. California*, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166 (1941). However, it makes no sense to say that only Campbell's due process rights were violated by the inconsistent theories. Either both defendant's were prejudiced by the prosecutor's actions or neither's were. This is especially true in this case because the fingerprints, blood tests, and a witness linked Campbell and not Drake to the crime. That evidence is highlighted by Campbell's subsequent recantation.

The state cannot divide and conquer in this manner. Such actions reduce criminal trials to mere gamesmanship and rob them of their supposed purpose of a search for truth. In prosecuting Campbell and Drake for the murder of Mr. Eberhart, the prosecutor changed his theory of what happened to suit the state. This distortion rendered Henry Drake's trial fundamentally unfair.

---

194, 196 (5th Cir.1980). In my opinion, however, Campbell's testimony did not have sufficient corroboration to meet the test of reliability.

12. This rule applies even if the falsity goes only to the credibility of the witness and the jury has other grounds to disbelieve the witness. *Napue, supra,* 360 U.S. at 269–70, 79 S.Ct. at 1177.