**Larry J. JOHNSON,
Petitioner-Appellant,**

v.

**Louie L. WAINWRIGHT, Secretary,
Florida Department of Corrections,
Respondent-Appellee.**

No. 85–3057.

United States Court of Appeals,
Eleventh Circuit.

Dec. 2, 1985.

* Honorable George C. Young, U.S. District Judge for the Middle District of Florida, sitting by designation.

Baya Harrison, Tallahassee, Fla., Steven L. Seliger, Quincy, Fla., for petitioner-appellant.

Mark Menser, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, Fla., for respondent-appellee.

Before VANCE, HENDERSON and CLARK, Circuit Judges.

VANCE, Circuit Judge:

The petitioner, Larry Joe Johnson, is a Florida inmate who was sentenced to death and to a consecutive life sentence for robbing and murdering a service station operator. He now appeals the district court's denial of his motion for habeas corpus relief, contending that his conviction and/or sentence were invalid on six constitutional grounds. We affirm.

I

Johnson was charged with robbing and fatally shooting James Maxwell Hadden on March 16, 1979. The state's case in the guilt phase[1] was based primarily on the testimony of Patty Burks, a seventeen year old girl who had accompanied Johnson for two weeks on a trip from Kentucky to Florida. According to her testimony, she and Johnson had decided earlier in the day to leave Florida and go to Minnesota where she had relatives. As they drove west on Interstate 10, Johnson stopped at a Shell service station in Lee, Florida, and told Burks to go inside to buy some cigarettes. While she was inside, Johnson entered carrying a sawed-off 12 gauge shotgun and told Hadden, the attendant, to open the cash register. At Johnson's direction Burks removed the money and started out the door. As she looked back she saw Johnson shoot Hadden. In the car afterward, Johnson told Burks that the attendant had a gun, and "it was us or him." He also told Burks that "dead witnesses don't talk."

After the shooting, Johnson and Burks drove to Burks' hometown of Beaver Dam, Kentucky. While Johnson waited down the road in his car, Burks telephoned her mother from a friend's home and told her about the shooting. Police arrived, arrested

---

1. As Justice Stevens recently explained, Florida has adopted a "trifurcated" procedure for identifying the persons convicted of a capital felony who shall be sentenced to death. It consists of a trial followed by a determination of guilt or innocence by the jury, then a separate sentencing hearing after which the same jury renders an advisory sentence, and finally an actual sentence imposed by the trial judge. *Barclay v. Florida*, 463 U.S. 939, 960, 103 S.Ct. 3418, 3429, 77 L.Ed.2d 1134 (1983) (Stevens, J., concurring in the judgment).

Johnson, and confiscated the gun and shells from his car. Fingerprints taken from the service station and testimony by a firearms expert were consistent with Burks' testimony. Based on this and other evidence, the jury found Johnson guilty of first degree murder and robbery with a firearm.

In the penalty phase, the state supported its request for the death penalty with evidence that Johnson was on parole for second degree assault at the time of the killing. Johnson introduced mitigating evidence in the form of testimony by family members, along with testimony and documentary evidence from psychologists that Johnson's actions were the result of "posttraumatic stress disorder" (PTSD), an emotional disorder resulting from his experiences in Vietnam. The state countered the psychological evidence with its own psychiatric testimony that Johnson was not suffering from PTSD. At the conclusion of the penalty proceeding, the jury recommended death for the murder and a consecutive life sentence for the robbery. The trial court then issued an opinion in which it adopted the jury's recommendation and set out findings that the crime was committed under three statutory aggravating circumstances and no mitigating circumstances.[2]

On November 17, 1983 the Florida Supreme Court affirmed both of the convictions and sentences, and on January 16, 1984 it denied rehearing. *Johnson v. State,* 442 So.2d 185 (Fla.1983). The United States Supreme Court denied Johnson's petition for certiorari. *Johnson v. Florida,* 466 U.S. 963, 104 S.Ct. 2182, 80 L.Ed.2d 563 (1984). On January 23, 1985 the Circuit Court of the Third Judicial Circuit of Florida denied Johnson's Rule 3.850 motion for post-conviction relief without hearing. The Florida Supreme Court affirmed the denial on January 28, also denying Johnson's petition for a writ of habeas corpus. *Johnson v. Wainwright,* 463 So.2d 207 (Fla.1985). The same day, Johnson filed a federal habeas corpus petition and a motion for stay of execution in the United States District Court for the Northern District of Florida. On January 29, the district court denied the writ but granted a certificate of probable cause. This court stayed the execution pending further order.

## II

### A. DUAL ROLE OF THE SHERIFF

Johnson's first argument for reversal is that he was denied his right to a fair trial and reliable sentence when the Madison County Sheriff both acted as bailiff and assisted the prosecution by investigating the crimes and aiding counsel during jury selection. According to petitioner, a number of Supreme Court cases establish that such a dual role violated his due process rights by improperly blending the neutral and adversarial functions of the criminal justice system. Johnson argues further that a showing of actual prejudice need not be made because the sheriff's dual role constituted a per se constitutional violation under *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965).

In *Turner,* two deputy sheriffs served dual roles as principal prosecution witnesses and jury custodians. Concluding that "it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution," 379 U.S. at 473, 85 S.Ct. at 550, the Court reversed judgment without requiring a showing of actual prejudice. The Court was concerned that the witnesses' roles as officers of the court was so likely to make the jury give particular credence to their testimony that the defendant was deprived of his right to a fair weighing of the evidence. Similarly, in *Gonzales v. Beto,* 405 U.S. 1052, 92 S.Ct. 1503, 31 L.Ed.2d 787 (1972), the Court found inherent prejudice when the county sheriff served both as key prosecution witness and as bailiff.

**2.** For a complete list of the aggravating and mitigating circumstances listed in the Florida death penalty statute, see Fla.Stat. § 921.141(5) & (6).

██ We agree that the concerns that motivated the Court to find constitutional violations in *Turner* and *Gonzales* are relevant here. Because a bailiff's exercise of his official duties is likely to give him added legitimacy in the eyes of a jury, *see Parker v. Gladden*, 385 U.S. 363, 365, 87 S.Ct. 468, 470, 17 L.Ed.2d 420 (1966), any participation he may have in the prosecution of the case carries at least the potential for prejudice. Whether that potential is so great as to warrant a per se rule of reversal depends, however, on how central a role he plays in the proceedings. *See Gonzales*, 405 U.S. at 1056, 92 S.Ct. at 1505 (Stewart, J., joined by Marshall & Douglas, JJ., concurring in the judgment). When either the individual's official contact with the jury or his participation in the prosecution is so minimal in the jurors' eyes as to have a *de minimis* impact on the jury's deliberations for all apparent purposes, some showing of actual prejudice must be made. *See id.* at 1054–55, 92 S.Ct. at 1504–05.

██ This, we believe, was such a case. Petitioner points out that the sheriff directly participated in the pretrial investigation, that his name came up during the testimony of several prosecution witnesses, and that he aided in the process of selecting the jury. Yet the sheriff never took the witness stand, and there has been no allegation that the jury even knew of his participation in the jury selection process. Given that the sheriff's participation in the state's actual presentation of its case was at most

peripheral as far as the jury could tell, petitioner presents no more than a speculative possibility that the sheriff's dual role influenced its deliberations. Since a per se rule of reversal is therefore inapposite, and since the petitioner has made no showing of actual prejudice, we reject his first argument.

## B. PETITIONER'S ABSENCE DURING SENTENCING PHASE

Petitioner's second ground for reversal has to do with his absence from the courtroom during a portion of the sentencing phase of the trial. Petitioner's absence occurred at the request of his own lawyer because one of the psychologists called by the defense asked that he not be present while she testified as to the results of her evaluation.[3] Johnson now alleges that his removal amounted to a violation of his fifth, sixth, eighth and fourteenth amendment rights.

██ We refrain from considering this issue because the petitioner waived his right to assert it on habeas corpus by failing to comply with Florida's procedural rule requiring assertion of such a claim on direct appeal. *See Engle v. Isaac*, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Johnson offers two rationales for holding that procedural default should not be found in this case. First, he asserts that the Florida

---

**3.** According to the record, the following events occurred:

MR. HUNT [defense]: Your Honor, at this time I would like to allow the defendant to wait outside of the courtroom while this witness is testifying. By a prior arrangement, it was agreed he will not be present at the time she is discussing her findings.

THE COURT: At the request of the defendant and his counsel, it will be permitted.

MR. HUNT: We are so requesting.

THE COURT: Mr. Hunt, I will leave it up to you when you wish him to come back in.

(DEFENDANT SHOWN OUT OF THE COURTROOM).

BY MR. WEISS:

Q Doctor McMahon, there may be some interest among the jurors as to why we asked Mr. Johnson to leave the courtroom. Can you explain your reasons for not wanting him here?

A I always ask an individual be removed for several reasons. One, I don't think it is to his advantage to hear anyone sit and discuss his psychological functions. Secondly, the average individual who comes into these sorts of assessments comes in cold, has no way of knowing how to falsify them in any way. If he sits through it, this would really prejudice any future evaluation that might be done with him or if he is to receive any treatment, this could certainly prejudice this in a sense, what I say may become a self-fulfilling prophesy. [TR. 901–02]

Supreme Court waived the procedural bar by ruling on the merits of the issue in his state habeas corpus proceeding. Second, he claims that he has demonstrated cause for and prejudice from the failure to press his claim in the state proceeding, thereby excepting this claim from the *Sykes/Isaac* procedural default rules. We cannot find merit in either of these contentions.

According to our reading of the Florida Supreme Court's opinion, that court made clear that it was not considering petitioner's claim on its merits, but rather was only considering whether his appellate counsel's failure to assert it on direct appeal amounted to ineffective assistance under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984). The court noted, for example, that "although the petitioner argues that relief should be granted because the omitted point of appeal, had it been argued, would have been found meritorious ..., the merits of that legal point" were not before the court. *Johnson v. Wainwright*, 463 So.2d 207, 209–10 (Fla.1985). Later, the court reiterated that it would "not reach the question of whether petitioner's absence from the courtroom was fundamental error or even simple legal error." *Id.* at 211. When Johnson reasserted his claim in his contemporaneous appeal of its denial of his motion to vacate judgment and sentence under Florida's collateral appeal proceeding, the court further stated that the claim was one of a number of "matters that should have been and ... could have been

raised by the initial appeal and therefore are not proper grounds for relief by motion to vacate under Rule 3.850." *Id.* at 212. Given this language, we cannot adopt the petitioner's position that the Florida Supreme Court waived its procedural default rule by passing on the merits of this claim.[4]

Petitioner's second ground for avoiding the procedural bar rule is that he has demonstrated both cause for and prejudice from his failure to preserve the claim for collateral review. We agree that petitioner has a persuasive argument that he had good cause for his failure to comply with the Florida rule requiring a contemporaneous objection at trial. That rule is designed to encourage counsel to bring out objections in the proceedings at the point where they are best understood and most efficiently considered. It would be anomalous, however, to apply the rule to bar habeas corpus review where the constitutional inquiry relates to the defendant's, as opposed to his lawyer's, failure to exercise his rights knowingly. We cannot fault the defendant for failing to assert an objection when his attorney—the individual on whom he depended to preserve his rights—arranged for him to be removed from the courtroom. The same cannot be said, however, of petitioner's failure to assert the claim while represented by new counsel on direct appeal. We agree that the failure to afford the state courts the opportunity to consider the claim at that stage must constitute a waiver.[5] We therefore find that

---

**4.** Petitioner also attempts to avoid procedural default by arguing that the Florida Supreme Court applies no consistent default rules in this area and that therefore we should not be deterred by its decision to be unduly harsh in this one instance. *See Francois v. Wainwright*, 741 F.2d 1275, 1281 (11th Cir.1984). Our reading of the case cited by petitioner, *Hall v. State*, 420 So.2d 872 (Fla.1982), does not, however, support his assertion that the Florida Supreme Court is applying its procedural default rule in a sporadic and surprisingly harsh manner. In that case, the court squarely held that the petitioner's assertion was not cognizable due to procedural default, and made clear that its further discussion of his claim was a secondary ground for denial. This circuit has held that "where a state court clearly and correctly applies a procedural

default rule, *Sykes* requires the federal court to abide by the state court's decision even though the state court discusses the merits as an alternate ground for rejecting the claim." *Dobbert v. Strickland*, 718 F.2d 1518, 1524 (11th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984).

**5.** Attached to the petitioner's state habeas petition was the affidavit of one of the lawyers who represented him on direct appeal. That lawyer stated that he omitted the point in question because he "did not spot it." Whether this omission amounted to inadequate representation is an issue not before us. It is clear, however, that such a reason cannot amount to "cause" under the *Sykes/Isaac* test.

the petitioner fails to meet the first prong of the *Sykes/Isaac* cause and prejudice test.

## C. TRIAL JUDGE'S FAILURE TO CONSIDER NON–STATUTORY MITIGATING FACTORS

■ Johnson's third claim is that the trial judge erroneously assumed that he could not consider non-statutory mitigating circumstances in deciding whether to impose the death penalty. He points out that the trial judge made no specific reference to the non-statutory mitigating factors introduced by the defendant, instead limiting the sentencing order to three of the mitigating circumstances enumerated in Florida's death penalty statute.

Petitioner is correct that consideration of non-statutory mitigating factors is required under *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) and *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion). Neither of those cases establishes the weight which must be given to such evidence, however; "they simply condemn any procedure in which such evidence has no weight at all." *Barclay v. Florida*, 463 U.S. 939, 961 n. 2, 103 S.Ct. 3418, 3430 n. 2, 77 L.Ed.2d 1134 (1983) (Stevens, J., concurring in the judgment). We agree with the district court that the sentencing order read in its entirety, combined with the court's instructions to the jury, indicates that the trial court gave adequate consideration to the evidence presented. In the words of the district court:

First, "[t]he fact that the sentencing order does not refer to the specific types of non-statutory 'mitigating' evidence petitioner introduced indicates only the trial court's finding the evidence was not mitigating, not that such evidence was not considered." *Dobbert [v. Strickland]*,

718 F.2d [1518,] at 1524 [[11th Cir.] (1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3591 [82 L.Ed.2d 887] (1984) ]. Second, the petitioner lists "evidence of mental or emotional disturbance which may not have met the statutory standard, Defendant's service to his country during two tours in Vietnam ..." as non-statutory mitigating circumstances adduced at trial. The trial judge referred expressly to the testimony concerning mental disturbance and the asserted causal link to defendant's Vietnam service in the sentencing order. Finally, the trial judge correctly instructed the jury that they were to consider all evidence of mitigating circumstances, including but not limited to the statutory circumstances. In view of all this, no inference may be drawn from the trial judge's use of the statutory list of mitigating circumstances as a format for writing the sentencing order that he failed to consider non-statutory mitigating circumstances.

Like the district court, we believe that these aspects of the record establish that the trial judge knew he could, and did, consider any non-statutory mitigating factors introduced by the petitioner. *See also Palmes v. Wainwright*, 725 F.2d 1511, 1523 (11th Cir.) ("we cannot conclude that because the sentencing order discusses only the statutorily mandated factors that the other evidence was not considered"), *cert. denied,* —— U.S. ——, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984).

## D. IMPROPER PROSECUTORIAL ARGUMENT

Johnson's fourth ground for reversal relates to the prosecutor's closing arguments during the sentencing proceeding. He asserts that three comments made by the prosecutor were so improperly prejudicial as to require a new sentencing proceeding.[6]

---

**6.** Of the three arguments criticized by the petitioner, only one precipitated any objection on the part of the defense lawyer. This court has concluded that the failure to object to improper prosecutorial arguments does not necessarily preclude review, but should be weighed as part of our evaluation of the claim on the merits

because of its suggestion that the defense did not consider the comments in question to be particularly harmful. *See Brooks,* 762 F.2d at 1397 n. 19; *Drake,* 762 F.2d at 1461 n. 16; *Tucker (William),* 762 F.2d at 1484 n. 5; *Tucker (Richard),* 762 F.2d at 1505 n. 13. Because we conclude that the arguments being criticized

■ This court has recently given exhaustive consideration to similar claims in its en banc opinions in *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir.1985), *Drake v. Kemp*, 762 F.2d 1449 (11th Cir.1985), *Tucker (William) v. Kemp*, 762 F.2d 1480 (11th Cir.1985) and *Tucker (Richard) v. Kemp*, 762 F.2d 1496 (11th Cir.1985).[7] As we pointed out, prosecutorial arguments will not warrant habeas corpus relief unless they meet two requirements. First, they must have encouraged the jury to take into account matters that are not legitimate sentencing considerations. *Brooks*, 762 F.2d at 1403.[8] Second, they must have been so prejudicial, when viewed in the context of the entire sentencing proceeding, as to have rendered that proceeding "fundamentally unfair." *Id.* at 1400 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974)). The test for fundamental unfairness is whether "there is a reasonable probability that [the errors] changed the outcome of a case." *Brooks*, 762 F.2d at 1402; *see also Drake*, 762 F.2d at 1460.

■ The first statement criticized by the petitioner is the prosecutor's reference to the loss experienced by the victim's family. The prosecutor stated that:

> You have heard some evidence presented by the defense here designed to tug at your heart strings, to show you that the defendant was a living, breathing human being with feelings possessed by an ordinary person. You have become acquainted with his family here today. Another family, perhaps you haven't become closely associated with, that is the Hadden family, will be facing this holiday season one short. [Tr. 938]

This court found an almost identical argument permissible in *Brooks*. We held that a reference to the loss suffered by the victim's family "is no more than a compelling statement of the victim's death and its significance," a matter relevant to the valid consideration of retribution in sentencing. We likewise conclude that the argument as made in this case was proper.

■ The petitioner next criticizes the portion of the prosecutor's argument which stated that his office seeks the death penalty in only a limited number of cases. The substance of the argument was as follows:

> I find myself doing something that I have not been previously called upon to do since being elected State Attorney. That is to stand before a jury of twelve persons and ask that jury to render an advisory opinion or advisory recommendation of the imposition of the supreme penalty provided for by the laws of our state and nation, the penalty of death. The fact that I have not yet, in the one year or almost one year I have served as State Attorney, been required to do that is a recognition I think that there are few cases that call for imposition of the death penalty. [Tr. 932]

These remarks were improper. *Brooks*, 762 F.2d at 1410; *Tucker (William)*, 762 F.2d at 1484; *Tucker (Richard)*, 762 F.2d at 1505. A prosecutor's exercise of the discretion necessary to his office typically carries great legitimacy because of the public's belief that he is carrying out his duties with expertise and in the interest of justice. While the prosecutor's reliance on this public trust is surely proper in many instances, it is not appropriate in a death

---

here, when viewed in the context of the entire proceeding, failed to render the trial fundamentally unfair, we find it unnecessary to consider how the lack of an objection should be assessed.

**7.** *Brooks* and its companion cases arose in Georgia. That state's death penalty statute reposes final sentencing authority with the jury, whereas Florida's scheme gives such authority to the judge. *Compare* Fla.Stat. § 921.141(3) *with* Ga. Code § 17–10–31. Because we find no error under the *Brooks* standard we need not decide whether Florida's scheme, given its diminished

reliance on the jury, requires a less stringent test for evaluating prosecutorial misconduct.

**8.** In *Brooks* and its companion cases we identified a number of matters which have been recognized as legitimate sentencing considerations. These include the character and background of the defendant (including future dangerousness and possible rehabilitation), the circumstances of his offense, and accepted penological justifications such as deterrence and retribution. *See Brooks*, 762 F.2d at 1406–08; *Drake*, 762 F.2d at 1458.

penalty proceeding where the choice of life or death has been purposely left in the first instance not with him but with the defendant's peers. By suggesting that his office had already carefully selected Johnson as one who was particularly deserving of the death penalty, the prosecutor tended to undermine the jury's perception that it had unfettered discretion to decline to impose the death penalty. *See Brooks,* 762 F.2d at 1410.

The last prosecutorial remark criticized by the petitioner is the prosecutor's assertion that, in his opinion, the death penalty was appropriate in this case.

> I know not what your views are on the death penalty, only on the basis of what you represented them to be. I want to stress to you, in as strong terms as I am able of generating, the death penalty is appropriate under certain circumstances. I believe these are appropriate circumstances. [Tr. 941]

An attorney's personal opinions are irrelevant to a sentencing jury's consideration. *Brooks,* 762 F.2d at 1408; *Drake,* 762 F.2d at 1459. To the extent that the prosecutor's arguments reflected such personal beliefs, they were improper.

Although two of the three arguments criticized by the petitioner were improper, we conclude that they were not so prejudicial in the context of the entire sentencing proceeding as to render the proceeding fundamentally unfair. Viewed as part of the prosecutor's entire speech, which otherwise related to legitimate sentencing concerns such as the defendant's past criminal history, his mental competence, and the nature of the crime, the remarks were relatively brief.[9] Furthermore, the rest of the prosecutor's speech, like the comments made later by the defense and the trial judge, tended to minimize the prejudicial impact of the few improper comments. All repeatedly referred to the list of aggravating and mitigating circumstances listed in Florida's death penalty statute, thereby channelling the jury's discretion in the direction of appropriate considerations. Fur-

thermore, the trial judge emphasized that the jury had a weighty choice before it and that it should exercise the utmost care in reaching its decision. Finally, the evidence of aggravating circumstances was overwhelming. Given these aspects of the sentencing proceeding, we see no reasonable probability that the prosecutor's few transgressions during oral argument caused the jury to recommend death when it would not otherwise have done so. The proceeding was not, therefore, rendered fundamentally unfair.

## E. TRIAL COURT'S FAILURE TO FIND MENTAL DISTURBANCE A MITIGATING CIRCUMSTANCE

■ Johnson next claims that the trial court erred in failing to find that he suffered from an extreme mental or emotional disturbance, a mitigating circumstance under Fla.Stat. § 921.141(6)(b), when he committed the murder. According to the petitioner, the court failed to give this testimony its proper weight because the emotional disturbance described, PTSD, had not at that time reached a stage of significant acceptance within the medical community. Now that it has, his argument goes, and now that it has also been recognized by the courts as a legitimate mental defect, *see Moody v. State,* 418 So.2d 989, 995 (Fla. 1982), *cert. denied,* 459 U.S. 1214, 103 S.Ct. 1213, 75 L.Ed.2d 451 (1983), Johnson should be given the opportunity to present it in a new sentencing hearing where it will be given the weight that it merits.

Had the trial court concluded that it could not consider the evidence of PTSD as a matter of law, its conclusion would have been error requiring reversal on habeas corpus. *Eddings v. Oklahoma,* 455 U.S. 104, 113–14, 102 S.Ct. 869, 876–77, 71 L.Ed.2d 1 (1982). Where the issue is one of fact, however, we accept the state courts' decisions about the weight of mitigating evidence absent fundamental error. *See id.* at 117, 102 S.Ct. at 878. No such error has been shown on this record. Indeed, the

---

**9.** The prosecutor's argument in its entirety took up approximately eight transcript pages.

state introduced substantial testimony by two psychiatrists rebutting the defense's claim that Johnson suffered from PTSD. Given the evidence before the trial court, we cannot conclude that it committed reversible error in refusing to find that the petitioner suffered from a mental disturbance sufficient to constitute a mitigating factor.

## F. TRIAL COURT'S RELIANCE ON ITS OBSERVATIONS OF THE PETITIONER

Finally, Johnson contends that the trial judge erred in taking into account his demeanor during trial, along with his testimony in a pretrial hearing on a motion to suppress, in deciding on death as the appropriate sentence. *See* APPENDIX at 635. Johnson points out that he chose to exercise his fifth amendment right not to testify, and argues that the use of such observations violates that right under *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Alternatively, he argues that even if the court could have taken his demeanor into consideration, it could only do so after giving him notice and the opportunity to explain or deny his behavior under *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977).

 We believe that more recent Supreme Court decisions establish that there was no reversible error in either the trial judge's reliance on his observations of the petitioner or his failure to inform defense counsel beforehand. The Court has stated that as long as the final sentencer's discretion is "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action," *Zant v. Stephens*, 462 U.S. 862, 874, 103 S.Ct. 2733, 2741, 77 L.Ed.2d 235 (1983) (quoting *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell & Stevens, JJ.)), it "is free to consider a myriad of factors to determine whether death is the appropriate punishment." *California v. Ramos*, 463 U.S. 992, 1008, 103 S.Ct. 3446, 3456, 77 L.Ed.2d

1171 (1983). Unlike a trial, which is focused on the single issue of guilt, the sentencing phase is a multifaceted inquiry in which "there is no single determinative issue apart from the general concern that the penalty be tailored to the individual and the offense." *Id.* at 1009, 103 S.Ct. at 3457; *see also Stephens*, 462 U.S. at 878, 103 S.Ct. at 2743. Thus, it is constitutionally permissible to consider the defendant's criminal record, *see Barclay*, 463 U.S. at 951 n. 8, 103 S.Ct. at 3425 n. 8 (plurality opinion), the possibility of commutation, *see Ramos*, 463 U.S. at 998–1009, 103 S.Ct. at 3451–57, and the contents of presentence reports, *see Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), in determining the appropriateness of the death penalty, even though such matters would be inappropriate at the guilt phase. We do not believe that the petitioner's demeanor is any less relevant to the individualized sentencing proceeding than the matters so far found permissible by the Court.

 We also do not believe that the trial court erred in failing to give advance notice that it planned to take petitioner's demeanor into account. In so concluding, we distinguish this case from *Gardner*, in which the Supreme Court vacated a death sentence because the sentencing judge relied in part on information in a presentence investigation report without disclosing confidential portions to defense counsel. In *Gardner*, the Court was concerned that by relying on unrevealed information in such a report, the trial court might base its decision on "confidences which may bear no closer relation to fact than the average rumor or item of gossip." 430 U.S. at 359, 97 S.Ct. at 1205. The Court thought it essential to due process to ensure the reliability of such a source of information by giving defense counsel the opportunity to evaluate its contents and dispute them. A court's evaluation of the defendant's demeanor presents no such danger of factual inaccuracy. Indeed, a trial judge's evaluation of demeanor evidence is generally given great weight because he has directly

perceived the evidence. Given this, we see no need for the judge to give advance notice of his intent to rely on demeanor evidence in making his sentencing decision.

AFFIRMED.

## APPENDIX A

### TRIAL COURT'S WRITTEN FINDINGS IN SUPPORT OF DEATH SENTENCE

On the 13th day of December, 1979, in the Madison County Courtroom at Madison, Florida, the Defendant was found guilty of murder in the first degree for the death of JAMES MAXWELL HADDEN under Count I of the indictment charging premediated [sic] murder. He was also found guilty of robbery with a firearm of JAMES MAXWELL HADDEN under Count II of the indictment.

The undersigned Judge heard all of the evidence in this case and observed all of the witnesses as each testified.

Following receipt of the jury's verdict finding the Defendant guilty of murder in the first degree, a separate sentencing proceeding was held to determine whether the Defendant should be sentenced to death or life imprisonment. This proceeding was held four (4) days later on December 17, 1979.

FACTS:

The Defendant and his seventeen year-old female companion, both residents of the State of Kentucky, left that state approximately two weeks before the date of the homicide, which occurred on March 16, 1979, and traveled by automobile to Orange Park, Florida. The Defendant took with him a "sawed-off pump shotgun", the stock of which had been replaced by a pistol grip. The Defendant and his companion stayed at Orange Park for approximately two weeks and decided to travel to the State of Minnesota via Kentucky. During this trip they traveled westwardly on Interstate 10 through Madison County, Florida. They stopped at a rest area sometime before reaching the intersection of I-10 and State Road 255, at which time the "sawed-off shotgun" was removed from a suitcase in the vehicle in which they were traveling. Upon reaching the SR-255 exit, the Defendant stopped at a Shell service station located just off of I-10 and according to the girl's testimony, she was instructed to go in and buy some cigarettes. The Defendant followed her into the service station with the shotgun. The service station operator, JAMES MAXWELL HADDEN, was the only other person on the premises. After a brief conversation between the girl and the station operator concerning cigarettes, the Defendant demanded money from the station operator. The female companion was directed to remove all of the cash, approximately $135.00, from the cash register and she complied. She then proceeded to leave the station, but before reaching the exit door, she turned to see the Defendant fire a single shot which hit the station operator in the head and apparently killed him instantly. She further testified that the service station operator had no weapon of any type.

The Defendant and his companion then proceeded to travel in his motor vehicle, ultimately arriving in the State of Kentucky. When outside of the Defendant's presence, the young girl reported the murder to her mother and ultimately the police were called. The Defendant was subsequently arrested the same day (two days after the murder) and he had in his possession the same "sawed-off shotgun" as well as other incriminating evidence.

Shortly after the homicide took place, the Defendant remarked to his companion that "dead witnesses don't talk".

The jury rendered an advisory sentence of death.

The death sentence was imposed.

AGGRAVATING CIRCUMSTANCES:

This Court has considered all of the aggravating circumstances enumerated under Section 921.141(5), Subsections (a) thru (h), Florida Statutes 1978. At the urging of defense counsel, the Court has not considered Subsection (i), Florida Statutes: 1979, for the reason that the later statute was effective after the date of the commis-

sion of the crime, although before the date of the commencement of the trial. The same circumstances were submitted to the jury for an advisory sentence.

As to Aggravating Circumstance (5)(a), the Court finds that the capital felony was committed while the Defendant was under sentence of imprisonment. The evidence produced at the sentencing stage showed that the Defendant had previously been convicted of assault in the second degree, had served part of a five year sentence, and was at all material times on parole for that offense.

As to Aggravating Circumstance (5)(b), the Court finds that the Defendant was previously convicted of a felony involving the use of or threat of violence to the person of another. The evidence showed that the Defendant had previously been convicted of assault in the second degree, the specific facts of which showed that the Defendant had shot his wife with a firearm.

Both of the above circumstances arose out of the same factual situation, and are therefore probably duplicative. Consequently, Aggravating Circumstances (5)(a) and (5)(b) are considered by the Court as constituting only one aggravating circumstance.

As to Aggravating Circumstance (5)(a), the Court finds that there is no basis for finding that the Defendant knowingly created a great risk to many persons.

With respect to Aggravating Circumstance (5)(d), the Court finds that the capital felony was committed while the Defendant was engaged in the commission of a robbery. The evidence was overwhelming in this respect and there was virtually no contradiction or lack of credibility on this issue.

With respect to Aggravating Circumstance (5)(f), the Court finds that the capital felony was committed for pecuniary gain. Pecuniary gain arose from the facts which showed that the Defendant took a sum of money during the course of the robbery. Because the same underlying facts give rise to support for both Aggravating Circumstances (5)(d) and (5)(f), the Court considers them to be duplicative and thus considers both as one aggravating circumstance.

With respect to Aggravating Circumstances (5)(e) and (5)(g), the Court finds that the capital felony was committed for the purpose of avoiding or preventing a lawful arrest and to hinder the enforcement of laws. The evidence showed that this robbery was committed at a service station in a rural area; that the decedent operator of the service station was the only person on the premises other than the Defendant and his companion, and that there could have been no other reason for killing the decedent other than to leave no witnesses to the crime. Direct sworn testimony from the Defendant's companion, who was an eye-witness to the robbery and murder, reflected that the Defendant told her he killed the service station operator because "dead witnesses don't talk". The Court finds that the facts giving rise to Aggravating Circumstances (5)(e) and (5)(g), are duplicative, and are therefore considered as one aggravating circumstance.

With respect to Aggravating Circumstance (5)(h), the Court finds that the capital felony does not fit within the definition of "especially heinous, atrocious, or cruel", as defined by the Supreme Court of Florida.

MITIGATING CIRCUMSTANCES:

With respect to Mitigating Circumstance (6)(a), the Court finds that the facts of this case are not applicable because of the evidence supporting Aggravating Circumstances (5)(a) and (5)(b).

With respect to Mitigating Circumstance (6)(b), the Court does not find any credible evidence which would qualify in that respect. The reasons will be more fully discussed in connection with Mitigating Circumstance (6)(f).

With respect to Mitigating Circumstance (6)(c), there is absolutely no credible evidence to support any contention that the

victim was a participant in the Defendant's conduct or consented to the act.

With respect to Mitigating Circumstance (6)(d), there was no credible evidence to support any contention that the Defendant was an accomplice in a capital felony committed by another person or that his participation was relatively minor. To the contrary, although the Defendant never took the stand either during the guilt phase or the sentencing phase, it was apparent from the testimony that the Defendant admitted in out of court statements that he was the one who pulled the trigger and killed the decedent. This was consistent with the eye-witness testimony of the Defendant's companion and the testimony of the two psychiatrists and the two psychologists who interviewed the Defendant.

With respect to Mitigating Circumstance (6)(e), there was no credible evidence to support any contention that the Defendant acted under extreme duress or under substantial domination of another person. The Defendant apparently contended in psychological and psychiatric evaluations that it was not his idea to rob the place, but there was never any contention that he was an unwilling participant. His willingness was further corroborated by the fact that he was a male of the age of 33 years and his companion was a 17 year old girl.

With respect to Mitigating Circumstance (6)(g), the age of the Defendant at the time of the crime was 33 years and is not found to be a mitigating factor.

With respect to Mitigating Circumstance (6)(f), the Court finds that the Defendant was able to appreciate the criminality of his conduct and that there is no basis for concluding that the capacity of the Defendant to conform his conduct to the requirements of law was substantially impaired. There was some conflicting testimony on this point. The Defendant was examined by two psychiatrists and two clinical psychologists. All of the evidence from the experts indicated that the Defendant was able to distinguish that which is "right" from that which is "wrong" and that he was legally sane at all material times. However, the testimony from one clinical psychologist, Dr. Charles R. Figley, advanced the theory that the Defendant, at the time he actually pulled the trigger, did so from implusive [sic] behavior which had a direct casual [sic] relationship to his experience in Vietnam. This particular witness had written a book consistent with this theory, but readily admitted that he was one of the few people who have even done any work in this area. The theory or opinion was to some extent also supported by the testimony of another clinical psychologist, Dr. McMahon. Her opinion suggested that the Defendant suffered from organic brain damage and that he was of border-line intelligence. The testimony of the two clinical psychologists was disputed by the two psychiatrists. Taken as a whole, together with the Court's own observations of the Defendant during the trial, as well as his testimony in pretrial proceedings, this Court concludes that there were no mental or psychological factors sufficiently significant to support a conclusion as to any mitigating circumstance. The evidence clearly showed that the Defendant planned the robbery of the service station, executed the plan, and killed the service station operator because "dead witnesses don't talk". The State introduced into evidence the shotgun with which the Defendant killed the service station operator. The shotgun was owned by the Defendant for a substantial period of time prior to the homicide and was found in his possession two days after the homicide was committed. A visual examination of the shotgun plainly shows that the barrel had been sawed off and the stock had been replaced with a pistol grip. Such a shotgun had only one practical purpose—the use for which it was in fact made. This leads the Court in part to the conclusion that the Defendant fully appreciated the criminality of his conduct and had no intention of conforming his conduct to the requirements of law. It further supports this Court's conclusion that the Defendant was not acting under extreme duress or under the substantial domination of another person.

Thus this Court concluded, in reaching its decision to impose the death penalty, that there were:

A. No mitigating circumstances.

B. Three aggravating circumstances consisting of:

(1). A combination of statutory Aggravating Circumstances (5)(a) and (5)(b);

(2). A combination of the statutory Aggravating Circumstances (5)(d) and (5)(f);

(3). A combination of the statutory Aggravating Circumstances (5)(e) and (5)(g).

The aggravating circumstances warrant the imposition of the death sentence and there are no mitigating circumstances to outweigh the aggravating circumstances.

This Court placed the greatest weight upon the facts supporting Aggravating Circumstance (5)(d). Had this been the only aggravating circumstance and even if the evidence adduced had as a matter of law supported Mitigating Circumstances (6)(b), (6)(e), and (6)(f), this Court would have concluded that the death sentence would have nevertheless been appropriate in this case.

This was a senseless killing, and when considered in the light of the statutory circumstances with respect to both aggravation and mitigation, this Court feels that this sentence is clearly warranted.

Signed this 31st day of January, 1980.